482 S.E.2d 663

STATE of West Virginia ex rel. The WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Legal Custodian of Stephen B. and Justin B., Juveniles, Petitioner

v.

Honorable John R. FRAZIER, Judge of the Circuit Court of Mercer County, Respondent.

No. 23530.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 10, 1996.

Decided Dec. 17, 1996.

**680**

Barbara L. Baxter, Assistant Attorney General, Charleston, for Petitioners.

William Flanigan, Sanders, Austin, Swope & Flanigan, Charleston, and John M. Hedges, Byrne & Hedges, Morgantown, for Respondent.

David Anthony Sade, Executive Director and Legal Counsel Juvenile Facilities Review Panel, Charleston, for Amicus Curiae.

WORKMAN, Justice:

The West Virginia Department of Health and Human Resources ("DHHR" or the "Department"), as legal custodian for Steven B. and Justin B.,[1] seeks a writ of prohibition against the Honorable John R. Frazier to prevent the placement of these juveniles and any other juveniles into facilities already housing their respective licensed capacities. Additionally, DHHR seeks a directive from this Court[2] stating that circuit court judges are not authorized to make facility-specific placements.[3] Upon thorough consideration of these issues, we deny DHHR's request for a writ of prohibition.

I. Factual and Procedural Background

A. Steven B.

On January 31, 1996, Steven B.'s mother filed a juvenile petition against him, alleging that her son was a delinquent child under West Virginia Code § 49–1–4 (1995).[4] As

1. Consistent with our practice, we identify the juveniles involved in this case by initials only. *See In re Jonathan P.*, 182 W.Va. 302, 303, 387 S.E.2d 537, 538 n. 1 (1989).

2. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gatton Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

3. DHHR, both during oral argument and through their agency "plan," which is discussed subsequently in this opinion, expanded the scope of the relief it was seeking by requesting authority to make juvenile placement decisions after the circuit court determines that removal from the home is necessary in all cases other than those in which the juvenile is placed with the Department of Corrections or into detention.

4. Steven B.'s mother alleged that her son was delinquent on the grounds of being a child:

> (3) Who, without just cause, habitually and continually refuses to respond to the lawful supervision by such child's parents, guardian or custodian; [and]
> (4) Who is habitually absent from school without good cause[.]

W. Va.Code § 49–1–4(3), (4).

support for the petition, Steven B.'s mother alleged that he kept running away from home and that he was habitually truant. During the initial hearing in this matter on March 25, 1996, the circuit court provisionally denied the request of Steven B.'s counsel for an improvement period and directed that a psychological evaluation be conducted. At the April 29, 1996, adjudicatory hearing, Judge Frazier received the results of the psychological report[5] and ultimately found Steven B. to be delinquent by reason of incorrigibility and truancy. The circuit court agreed to the request of Steven B.'s counsel that additional time be granted to investigate appropriate placement alternatives. Convinced that Steven B.'s home could not provide the necessary safety and security and further recognizing that Steven B.'s mother was looking to the court for help, the circuit court questioned the DHHR caseworker regarding emergency shelter placement. Upon being apprised of no shelter availability, the circuit court ordered temporary placement at Pressley Ridge–Grant Garden ("Pressley Ridge") juvenile facility—a rehabilitative facility for status offenders located in Ona, West Virginia—until Steven B.'s next scheduled court date of May 20, 1996.

According to DHHR, it informed Judge Frazier at the adjudicatory hearing that the Pressley Ridge facility was at its statutory capacity of twenty children. The record, however, supports Judge Frazier's position that the Department only informed him that all the emergency shelters were filled. DHHR did protest the fact that the Ona facility had never been used for temporary placement purposes. In response to this concern, Judge Frazier stated:

> The Court will direct that he be placed at Ona in—our secure facility to avoid him—to avoid any absconding or running by him at this point. If the Department has another location that's reasonably secure the Court would allow that, but I don't know of

any other secure facility in West Virginia other than Ona, at this point. . . .

The final dispositional hearing took place as scheduled on May 20, 1996. During this proceeding, the circuit court was informed by both the juvenile probation officer and the Pressley Ridge representative that Steven B. had demonstrated positive improvement as a result of his stay at Ona. The results were such that Steven B.'s own counsel requested that Steven B. be permitted to stay at Ona, which request the court granted.

## B.   Justin B.

As in Steven B.'s case, Justin B.'s mother initiated the delinquency proceeding by filing a petition, alleging that her son was verbally abusive and physically assaultive as well as habitually truant from school. During the adjudicatory hearing held on May 20, 1996, Justin B.'s mother and sister offered evidence that Justin B. would stay out all night or be gone for several days at a time. His mother and sister testified additionally that Justin B. had stolen cars belonging to each of them;   he was physically assaultive and threatened to kill both of them;   he drank; and he had been suspended from school and was not permitted to return. After hearing all the evidence, the circuit court concluded that Justin B. was out of control and adjudicated him delinquent within the meaning of West Virginia Code § 49–1–4.

Pending a determination of final disposition, the circuit court ordered Justin B. into the custody of the DHHR for immediate placement in an emergency shelter. Recognizing that immediate placement might be difficult due to crowded facilities, the court provided the leeway of permitting Justin B. to remain with a relative for one additional day:

> It is the finding of the Court that emergency placement is extremely limited at this time;   therefore, the Court directs that the Respondent [Justin B.] may remain

---

**5.**   According to the psychological report, Steven B.'s history since the age of 12 included repeated arrests for shoplifting, fighting, and drinking; problems at home and school; and a brief psychiatric hospitalization stemming from alcohol use.   The psychologist concluded that Steven B.'s "behavioral problems [were] significantly getting worse over the past year."   Regarding the future, the psychologist opined that "[t]he prognostic picture for Steven appears to be poor.   He is likely to violate the conditions of any probation and his propensity for recidivism is extremely high for alcohol related offenses."

with relatives this date and that he shall be moved thereafter. If placement cannot be found, the Department shall find shelter and if necessary shall sit with the said Respondent.

DHHR complains that the circuit court exceeded its authority in directing it to "babysit" Justin B., if necessary.[6]

In a separate, but related,[7] juvenile disposition case, Judge Frazier held DHHR in contempt on September 28, 1994 for its failure to construct sufficient facilities for juvenile status offenders. He stayed entry of the order[8] entered in that case pending the outcome of this matter.

## II. Discussion

▮ We first examine whether a circuit court has the authority to direct the placement of a juvenile into a specified facility. DHHR takes the position that there is no provision in the West Virginia Code which permits a circuit court to make facility-specific placements. General jurisdiction over juvenile proceedings is vested in the circuit courts pursuant to West Virginia Code § 49–5–2(a) (Supp.1996). The specific authority to render decisions regarding the disposition of juveniles is expressly granted to circuit courts by West Virginia Code § 49–5–13 (Supp.1996). That statute provides:

Following the adjudication, *the court shall conduct the dispositional proceeding*, giving all parties an opportunity to be heard. *In disposition the court* shall not be limited to the relief sought in the petition and shall, *in electing from the following alternatives*, consider the best interests of the child and the welfare of the public[.]

W. Va.Code § 49–5–13(b) (emphasis supplied).[9]

Evidence of the circuit court's authority to specify placements is found in the various dispositional alternatives that are delineated in West Virginia Code § 49–5–13(b)(1)–(6) for the circuit court's consideration and ultimate election:

(4) Upon a finding that a parent or custodian is not willing or able to take custody of the child, that a child is not willing to reside in the custody of his parent or custodian, or that a parent or custodian cannot provide the necessary supervision and care of the child, the court may place the child in temporary foster care or temporarily commit the child to the state department or a child welfare agency. . . .

(5) Upon a finding that the best interests of the child or the welfare of the public require it, and upon an adjudication of delinquency pursuant to subdivision (1),

6. The record indicates that DHHR was not required to sit with Justin B., as a bed was available when he arrived at the Paul Miller Shelter on May 21, 1996.

7. It is related in terms of demonstrating the history of the court system's continued attempts to work with DHHR, to no avail, to obtain the necessary facilities for status offenders.

8. Judge Frazier initially stayed the entry of its September 28, 1994, decision, until April 1995 "to give the Department and the Legislature an opportunity to address the fiscal aspect of a new, secure status offender facility." In April 1995, Judge Frazier learned that no action had been taken by either DHHR or the Legislature, but that the Governor had appointed a Task Force on Juvenile Detention Facilities. The circuit court again postponed the entry of its order to await the final report of the Task Force, which has, to this date, never been issued. The circuit court actually entered the order pertaining to its September 23, 1993, decision on August 12, 1996, but stayed the rulings therein pending resolution of this appeal. As will be more fully set forth,

Judge Frazier has been immensely patient in seeking the cooperation of DHHR in this matter.

9. That the disposition of juveniles is a task assigned solely to the judicial branch of government is further supported by the statutory provision which permits the circuit court to request that the juvenile probation officer "make an investigation of the environment of the child and the alternative dispositions available." W. Va. Code § 49–5–13(a). The juvenile probation officer, as an employee of the court system, has been statutorily selected to prepare this dispositional report. Formerly, either a juvenile probation officer or a "state department worker assigned to the court" had responsibility for preparing an investigatory report for the circuit court's use in aid of disposition. *See* W. Va.Code § 49–5–13(a) (1988). In 1993, the Legislature moved all juvenile probation officers to the judicial branch. Previously, the juvenile probation system operated in a bifurcated fashion, with some officers being under the auspices of DHHR and the other probation officers under the supervision of the judiciary.

section four [§ 49–4–1(1) ],[10] article one of this chapter, the court may commit the child to an industrial home, correctional institution for children, or other appropriate facility for the treatment, instruction and rehabilitation of juveniles: Provided That the court maintains discretion to consider alternative sentencing arrangements....

(6) Upon an adjudication of delinquency pursuant to subdivision (3) or (4), section four [§ 49–1–4(3) or (4) ], article one of this chapter, and upon a finding that the child is so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration, commit the child to a rehabilitative facility devoted exclusively to the custody and rehabilitation of children adjudicated delinquent....

W. Va.Code § 49–5–13(b)(4), (5), (6) (footnote added).

Since each of the quoted subsections of West Virginia Code § 49–5–13(b) expressly grants authority to the circuit courts to make facility-specific decisions concerning juvenile placements, DHHR's argument that circuit court judges are without statutory authority to order facility-specific placements is untenable. The Legislature undeniably has vested the circuit courts with dispositional authority as part of their jurisdiction over juveniles. In contrast to the placement decisions of sentenced adult offenders, which are controlled by the Division of Corrections,[11] a circuit court is vested with discretion to select the appropriate disposition for a particular juvenile provided that the specific findings required by statute as a prerequisite to such placement are made. *See* W. Va.Code § 49–5–13(b). The extent of a circuit court's discretion in placing juveniles is evidenced by the wide range of dispositional options available: community-based programs, rehabilitative facilities, correctional institutions, extra-parental supervision through probation officers, temporary shelter placement, or temporary placement with the DHHR. *See id.* In addition to its grant of discretionary authority regarding juvenile placement, the circuit courts are entrusted with the discretion to impose fines upon juveniles; require restitution; revoke driving privileges; require participation in public service projects, and direct participation in the teen court program[12] as a form of alternative sentencing, where appropriate. *See* W. Va.Code §§ 49–5–13b, 49–5–13d (Supp.1996). As these various statutes make clear, the Legislature both envisioned and empowered circuit courts to be the decision makers with regard to juvenile dispositions.[13]

10. West Virginia Code § 49–1–4 (1995) provides: "Delinquent child" means a child:
(1) Who commits an act which would be a crime under state law or a municipal ordinance if committed by an adult, punishable by confinement in a jail or imprisonment;
(2) Who commits an act designated a crime under a municipal ordinance or state law not punishable by confinement in a jail or imprisonment;
(3) Who, without just cause, habitually and continually refuses to respond to the lawful supervision by such child's parents, guardian or custodian;
(4) Who is habitually absent from school without good cause; or
(5) Who willfully violates a condition of a probation order or contempt order of any court.

11. *See* W. Va.Code §§ 62–13–5 (1992), 25–1–15 (1992), and 25–1–16 (1992).

12. This sentencing alternative is only available to status offenders. *See* W. Va.Code § 49–5–13d(a) (Supp.1996).

13. In its amicus brief, the Juvenile Facilities Review Panel argues that due process considerations mandate that any juvenile placement which involves commitment to a secure facility must take place in the context of a hearing at which the juvenile is represented by counsel. *See State ex rel. C.A.H. v. Strickler,* 162 W.Va. 535, 541, 251 S.E.2d 222, 226 (1979) (noting that "function of counsel at the dispositional phase of a juvenile proceeding is critically important"). In addition, this Court held in syllabus point three of *Strickler* that "in preparation for the dispositional hearing, the court and all counsel should explore and become knowledgeable of all possible resources available to the juvenile court in an effort to find the least restrictive dispositional alternative having reasonable prospects for successful rehabilitation." *Id.* at 536, 251 S.E.2d at 223; *but see infra* note 18 (discussing 1995 removal of statutory requirement from West Virginia Code § 49–5–13(b)(5) concerning "a finding of no less restrictive alternative" in connection with juvenile dispositions).

In an obvious attempt to expand the issues under consideration, DHHR suggests that a "joint effort between the judiciary and the Department" is the answer to the continuing dilemmatic subject of juvenile placements. Despite its use of the terms "joint effort," DHHR actually seeks placement authority tantamount to complete control over those juveniles who are not placed with the Department of Corrections or into West Virginia detention facilities.[14] The Department's specific proposal is that such juveniles be placed into its custody with no specifications for placement and the appropriate placement then will be determined by DHHR with the assistance of a multi-disciplinary team. As part of its plan, the Department seeks a minimum of ten days notice from a circuit court to permit placement decisions to be made in advance of the date on which a particular juvenile would be placed in its custody.

■ The plan DHHR proposes, through which it seeks placement authority, is fraught with numerous pitfalls, not the least of which is the Department's own track record of failing to live up to its various statutory duties and responsibilities. An example of the Department's inability to meet its current obligations is its failure to file even one of the annual reports contemplated by West Virginia Code § 49–5B–7 (1996).[15] Since its enactment in 1979, that statutory provision has required:

(a) The department of health and human resources shall from time to time, but not less often than annually, review its programs and services and submit a report to the governor, the Legislature and the supreme court of appeals, analyzing and evaluating the effectiveness of the programs and services being carried out by the department. Such report shall include, but not be limited to, an analysis and evaluation of programs and services continued, established and discontinued during the period covered by the report, and shall further describe programs and services which should be implemented to further the purposes of this article. Such report shall also include, but not be limited to, relevant information concerning the number of children comprising the population of any rehabilitative facility during the period covered by the report, the length of residence, the nature of the problems of each child, the child's response to programs and services and such other information as will enable a user of the report to ascertain the effectiveness of the facility as a rehabilitative facility.

W. Va.Code § 49–5B–7(a).[16] Thus, West Virginia Code § 49–5B–7 places a mandatory duty upon DHHR to prepare and submit to the Supreme Court, along with the Legislature and the governor, an annual report analyzing and evaluating the effectiveness of the programs and services being carried out by the Department.

14. The position taken by DHHR in its reply brief varies somewhat from its original petition, because the Department now admits that circuit courts are vested with statutory jurisdiction to place juveniles in detention, pre- and post-adjudication, and with the Department of Corrections. In those instances, however, where a circuit court chooses to place juveniles out-of-home and not into Corrections or detention facilities, DHHR maintains it has, or should have, the authority to make the placement decision. The only statutory support the Department provides for this position is West Virginia Code § 49–5–13(b)(4), which permits a circuit court to place a child "in temporary foster care or temporarily commit the child to the state department or a child welfare agency."

15. DHHR advised this Court by letter dated October 9, 1996, that "[t]he Department does not have the annual reports as they are required by statute." The Department promises in this same letter that it will "produce its first annual report" in January 1997. Because the letter simultaneously refers to both the annual report and the comprehensive youth services planning framework mandated by West Virginia Code § 49–5B–4, it is somewhat unclear whether the document that is to be filed in January 1997 is the same report contemplated by West Virginia Code § 49–5B–7(a).

16. Ironically, the legislative mandate to produce the annual report contemplated by West Virginia Code § 49–5B–7(a) emanated from the circuit courts' desire to enlist DHHR's help through preparation of a directory of placement alternatives. See H.B. 1484, 1979 W. Va. Acts, ch. 14 at 26 (including in bill's statement of purpose that chapter 49, article 5B was enacted to describe programs and services of rehabilitative facilities for status offenders and to provide catalogue of services).

Yet another illustration of the Department's non-compliance with statutory directives is its failure to "establish and maintain one or more rehabilitative facilities to be used exclusively for the lawful custody of status offenders." W. Va.Code § 49–5B–5 (1995). Like the statute directing the preparation of an annual report, this statutory obligation has been in effect since 1979. To date, however, the Department has completely disregarded this statutory directive to establish such a facility.[17] In failing to construct the facility required by West Virginia Code § 49–5B–5, DHHR clearly has fallen short of its statutory obligation to provide rehabilitative juvenile facilities that are devoted exclusively to status offenders.[18]

■ In criticism of the present approach to juvenile disposition, the Department derogatorily describes the system as "order-driven." The Department faults the current system for denying it the right to control juvenile placements and views itself as perpetually reduced to and limited to a role of merely reacting to court orders. In reality, however, the Department's function with respect to juvenile placement is not that of a non-participant, as it would have us believe. The Department should play an important role with regard to identifying the appropriate placement alternatives for juveniles, and this circuit court, like most of the circuit courts, clearly wanted the Department's assistance with this all-important duty. Through this role, DHHR assists the circuit courts and counsel in the fulfillment of their joint obligation to "explore and become knowledgeable of all possible resources available." Syl. Pt. 3, in part, *State ex rel. C.A.H. v. Strickler,* 162 W.Va. 535, 536, 251 S.E.2d 222, 223 (1979). While the Department does not always avail itself of the right to participate in a juvenile's placement recommendation, it nonetheless has the opportunity, and indeed the responsibility, to be an active participant in this process whenever the juvenile has been placed into DHHR custody or whenever the circuit court enlists the Department's participation in the placement process. *See* W. Va.Code § 49–5–13(a) (referring to circuit court's dispositional use of "social reports"). Furthermore, once a circuit court adjudicates a child delinquent pursuant to West Virginia Code § 49–1–4(3) or -(4) and finds that the child is so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration, then it is the responsibility of DHHR to assist the court in making its placement determination by providing the court with full information on placements and services available both in and out of the community. It is the court's responsibility to determine the placement.

DHHR further complains that the current system frustrates its statutory obligation to achieve "a balanced and comprehensive state program for children" within the system. W. Va.Code § 49–5B–2 (1995).[19] Specifically, the Department cites the absence of any incentives to develop and/or achieve the

---

17. DHHR gives two reasons regarding its failure to construct the facility required by West Virginia Code § 49–5B–5, one of which is lack of funds. The second explanation provided was the concern that the completion of such a facility would result in an increased number of juveniles needing placement in this type of facility. Borrowing from the recent movie "A Field of Dreams," which involves the prophetic building of a baseball field, the Department describes this concern as "if you build it, they will come."

18. Arguing that the executive branch is in a better position than the judicial to identify the need for additional juvenile beds, the Department suggests there is a need for additional diagnostic beds, but it vehemently objects to the need for additional secure facility beds. By diagnostic beds, the Department refers to short-term placement at an emergency shelter. DHHR believes that, if additional secure facility beds are available, courts will err on the side of housing juveniles in such facilities when in the Department's opinion the child would be better off in a less restrictive environment.

The statutory language which previously required "a finding that no less restrictive alternative would accomplish the requisite rehabilitation of the child" before committing a juvenile to a facility pursuant to West Virginia Code § 49–5–13(b)(5) was amended in 1995. The current standard for placement pursuant to this subsection is "a finding that the best interests of the child or the welfare of the public require it." W. Va.Code § 49–5–13(b)(5).

19. This statute expressly excludes from such program "those children that are committed to the care and custody of the department of corrections." W. Va.Code § 49–5B–2.

statutorily required system of balanced care because of its lack of power concerning placement decisions. While this "balance" argument was clearly crafted to support the Department's objective of seeking control of juvenile dispositions, we are unconvinced that judicial control of juvenile dispositions obviates the achievement of this prescribed balance. The Legislature clearly has delegated dispositional control of juveniles to the circuit courts, but this in no way abrogates the Department's statutory duty to achieve the "balanced and comprehensive state program for children."[20] *Id.*

Even if the Court were inclined to consider the DHHR plan,[21] the Department's historical shortcomings give us little hope that the plan, as described, would be brought to fruition. More important to our rejection of the Department's plan, however, is the clear legislative mandate that requires circuit courts to make placement decisions affecting juveniles. *See* W. Va.Code § 49–5–13(b). In addition to the statutory underpinnings for judicial placement of juveniles, placement by the courts is both socially and logically correct. Judges would be hesitant to attach their signatures to orders directing placement of juveniles based on the directive of a social services agency that is already so stressed that it frequently fails to live up to its existing responsibility in an effective manner. Likewise, this Court would be hesitant to entrust any responsibilities of such serious magnitude to DHHR when we see a track record of abysmal failures in so many arenas.[22] Notwithstanding the Department's obligation to assist courts in finding services,

treatment, and placement, where necessary, for juveniles, the circuit courts retain both the decisional authority and responsibility regarding the removal of juveniles from their homes and communities. These placement decisions, which are admittedly difficult to arrive at, are properly the responsibility of the circuit courts and not DHHR.

■ We turn next to the issue of whether a circuit court can order that a juvenile be placed at a particular facility when that facility is already at capacity. The Presley Ridge facility to which Judge Frazier ordered Steven B. is a rehabilitative facility for status offenders subject to the twenty-person limit imposed by West Virginia Code § 49–5B–5. In its petition, DHHR represents that there were already twenty juveniles being housed at Presley Ridge when the circuit court ordered Steven B. to that facility. Given the number of juveniles housed at Presley Ridge, the Department argues that Judge Frazier's order was in violation of West Virginia Code § 49–5B–5 as well as this Court's directive in syllabus point four of *Facilities Review Panel v. Coe*, 187 W.Va. 541, 420 S.E.2d 532 (1992), that "[n]o facility can accept any juveniles beyond their licensed capacity and must immediately report any attempt to force them to do so to the Department of Human Services and the Juvenile Justice Committee."

The concerns at issue in *Coe* differ somewhat from those present in this case as both of the placements at issue here are post-adjudicatory in nature.[23] Whereas we

---

**20.** This duty is in fact an ongoing responsibility as West Virginia Code § 49–5B–2 requires the "continuous[ ] refine[ment] and develop[ment]" of this plan.

**21.** This "plan," as best we can decipher from the Department's response brief, is simply that it be allowed to determine appropriate placement for all juveniles who are not placed with the Department of Corrections or into detention facilities without any direction whatsoever from the circuit courts. With regard to this plan, DHHR states that it "can operate a balanced system of care if it has control of placements." The Department describes this "balanced system" as "operat[ing] with emphasis on family and community involvement ... and be[ing] dedicated to ... rehabilitation and ... the least restrictive alternative placement...."

**22.** These observations are in no way intended to impugn the integrity, motivation, or ability of any DHHR personnel. It is an agency with a huge mission and limited resources.

**23.** The primary focus of *Coe* was the adoption of standardized guidelines for juvenile detention which would enable an initial evaluation of whether a juvenile should be released rather than detained at the *pre-adjudicatory* phase, with the emphasis being on release. *See* 187 W.Va. at 544, 420 S.E.2d at 535 (emphasis supplied). Included with the guidelines were certain protective measures which this Court adopted, believing such measures would relieve the inherent problems associated with overcrowded detention facilities. *Id.* at 544–45, 420 S.E.2d at 535–36. One of those protective measures is the directive

deemed it imperative to adopt certain protective measures in response to severely overcrowded detention facilities in *Coe*, the record in the present case does not suggest similar concerns of extreme overcrowding. The scenario presented in the Steven B. case is that of a facility being only one juvenile over capacity. While we are not attempting to minimize the naturally escalating safety issues that surface when a facility is understaffed in comparison to the numbers of juveniles being housed or held in a particular location, the Department readily admits that its true concern is not posed by the situation when a juvenile facility is simply over capacity for one or two days before beds become available due to discharge or transfer. In fact, in describing its own plan, the Department admits it would have no problem permitting a facility to be over capacity for a matter of days by obtaining a waiver of the capacity limit[24] if the facility otherwise meets the juvenile's needs and is closest in proximity to the juvenile's family. Furthermore, the reality which judges routinely face in juvenile cases is that the juveniles frequently are not in home settings that include one or more stable parents able to supervise the juvenile. As a result, such juveniles may present a danger to themselves, their family, or to others, and these same juveniles may be misused or abused upon their return to a home setting that lacks sufficient structure or stability. In other words, the danger to the juvenile to himself or to others, if he is not secured, must also be considered in this equation.

■ This Court clearly recognizes the problems facing the Department with regard to limited funding as well as the related issue of restricted space for specified types of juvenile housing. From this Court's vantage point, however, we are left with the observation that DHHR does not appear to be doing all that it can to create additional juvenile placements. In response to criticism regarding its failure to procure additional juvenile placements, the Department argues that the Legislature has directed it to focus on "community-based alternatives to juvenile detention and correctional facilities." W. Va.Code § 49–5B–4(a) (1995). While the Legislature certainly has approved the establishment and use of alternative programs and services by DHHR for juvenile rehabilitation purposes, the development and use of such programming clearly was intended to function in addition to the traditional types of juvenile services, rather than as a replacement. The statutory language authorizing alternative juvenile programs expressly states that such programs are "subject to the limits of funds available or otherwise appropriated therefor." *Id.* The alternative programs, rather than the traditional forms of juvenile rehabilitative care, would appear to be the first area in which cuts would have to be made in the face of funding shortages. Thus, the Department's reliance on the Legislature's sanctioning of alternative juvenile programming in explanation of its failure to procure a secure facility for status offenders is simply disingenuous. Furthermore, because we have been shown no evidence that such community-based programs are anything other than in the discussion stage, we observe that DHHR's reference to such programs appears to be a tactic aimed at saving dollars, rather than one aimed at dealing with the true problem of providing courts with alternative placements for juveniles who appear before the courts in need of stability, structure, and safety.

The circuit court judges are confronted with this problem of limited beds all too often. The seriousness of the space limitation issue is attested to by the fact that Judge Frazier, in a prior juvenile disposition referred to earlier, held DHHR in contempt for failing to construct a secure facility for juvenile status offenders in derogation of its responsibility under West Virginia Code

---

that a juvenile facility not accept any children beyond the facility's licensed capacity. *See id.* at 545, 420 S.E.2d at 536, and syl. pt. 4.

**24.** Pursuant to West Virginia Code § 49–2B–7 (Supp.1996), a waiver of the capacity limit can be granted by the commissioner for child welfare

§ 49–5B–5.[25] Judge Frazier ordered in that prior case:

> In order to purge itself of contempt, the West Virginia Department of Health and Human Resources shall within one hundred twenty days establish a secure facility (1) for adjudicated status offenders who are found by a court to be so unmanageable, ungovernable or anti-social that no other reasonable alternative exists for their treatment or restraint and (2) for temporary placement of status offender residents prior to adjudication who the courts find are likely to injure themselves or run away if placed in a less restrictive facility.

As noted above, Judge Frazier stayed the entry of this order pending the final ruling in this case. *See supra* note 8.

The prior juvenile case in which Judge Frazier attempted to induce DHHR to appreciate the seriousness of this ever-present problem of no placement positions for status offenders is intricately interwoven with the issues presented in this case. As Judge Frazier noted in his August 16, 1996, order, "West Virginia's juvenile facility problem is approaching a crisis level."[26] The circuit court in that same prior proceeding observed further:

> 1. Numerous juveniles under the jurisdiction of this court have been adversely affected by the lack of a secure facility for status offenders. These juveniles are either incorrigible status offenders or victims of abuse and neglect. None of them can function at home or with a relative. Many are chronic truants and most have emotional problems. The absence of a secure facility to stabilize the juveniles results in (a) their continued placement at home which exacerbated the problem, or (b) placement in a non-secure facility which invariably leads to the juvenile running away.
>
> 2. Many of these juveniles are chronic runners who run from virtually every non-secure placement. This requires substantial Department personnel time to track and return the juvenile. This substantial personnel resource is desperately needed for other juvenile services. More importantly, juveniles are at great risk while running. A number of female juveniles on run-away status have gotten pregnant, and several have been raped or beaten badly. Many juveniles commit criminal acts while on a run-away status which results in them going to a detention facility. Most of these runners' education is seriously disrupted and they fall further behind in school. Also, treatment programs are delayed.

▮ The Department's failure to establish the statutorily-required facilities for status offenders[27] and to provide sufficient in-

---

upon representation that the child's "health, safety or well-being" will not be endangered.

**25.** We observe that Judge Frazier's focus is the construction of a secure facility for status offenders. While the statutory language of West Virginia Code § 49–5B–5 does not direct DHHR to establish a facility that is to be designed for and used exclusively as a secure facility for status offenders, it does authorize that a portion of an otherwise non-secure facility be operated as a secure facility for status offenders found to be so unmanageable that no reasonable alternative to secure placement exists.

> The department of welfare [division of human services] shall, within the limits of state and federal funds appropriated therefore, establish and maintain one or more rehabilitative facilities to be used exclusively for the lawful custody of status offenders. Each such facility shall be, primarily, a nonsecure facility having as its primary purpose the rehabilitation of adjudicated juvenile offenders who are status offenders. Such facility ... shall minimize the institutional atmosphere and prepare the child for reintegration into the community ... Provided, however, That a portion of such facility may be designed and operated as a secure facility used exclusively for status offenders whom the juvenile court has specifically found to be so unmanageable, ungovernable and antisocial that no other reasonable alternative exists, or could exist, for treatment or restraint other than placement in a secure facility.

W. Va.Code § 49–5B–5(a).

**26.** We observe that perusal of the daily Charleston newspapers reveals numerous editorials and articles discussing the dismal situation faced by courts and law enforcement agencies with regard to juvenile placements for both detention and post-adjudicatory placement purposes.

**27.** In a draft report of the Governor's Task Force on Juvenile Detention Facilities dated November 1995, a specific recommendation is made to:

> Thoroughly review and make specific funding recommendations and other needed recommended amendments to Chapter 49, Article

state juvenile facilities forces us to reexamine our ruling in *Coe*. At first glance, the *Coe* ruling that prohibits a juvenile facility from accepting juveniles in excess of its capacity[28] appears to determine the outcome of this case. In practice, however, the capacity limits that govern juvenile facilities do not operate as a complete bar to the acceptance of additional juveniles because a facility may secure a waiver from the Office of Social Licensing of its given limit by stating that "the health, safety or well-being of a child would not be endangered thereby." W. Va. Code § 49–2B–7 (Supp.1996). While we are not advocating an endless cycle of reliance on waivers to avoid our ruling in *Coe*, we are equally disinclined to allow DHHR to use *Coe* as a shield to prevent circuit courts from ordering placements to in-state facilities. Accordingly, we hold that notwithstanding the directive issued by this Court in *Coe*, which addresses a juvenile facility's authority to accept additional juveniles upon reaching its capacity, a circuit court does not lack the authority to order that a juvenile be placed at a facility which is at capacity.[29] When a court-ordered placement will result in the operation of a facility over capacity for more than a few days, the Department must determine whether to seek a waiver of the capacity requirement or seek the relocation of juveniles already placed at that particular facility to avoid the concerns of overcrowding dis-

cussed in *Coe*. The DHHR cannot abrogate its responsibility, as part of the executive branch of state government, to construct or establish the necessary in-state facilities for juvenile care and treatment. As we emphasized in *Coe*, "[t]he Department of Human Services is duty bound to aggressively seek the funding from the Legislature necessary to fulfill ... [its] responsibilities[ ]" with regard to the construction of additional juvenile facilities, as well as the updating of existing structures. 187 W.Va. at 545, 420 S.E.2d at 536.

■ The Department suggests that the funding difficulties are partially attributable to the expense of out-of-state placements. According to a DHHR memorandum[30] not included as a part of the record of this case, a total of 373 children were in out-of-state residential placements as of August 24, 1996. The irony, however, is that a significant portion of these out-of-state placements are necessitated by the unavailability of in-state placement positions.[31] We further observe that these out-of-state placements, or more specifically the avoidance of such placements, appear to be the motivating factor behind the DHHR's actions in this case. Clearly, the circuit courts also seek to avoid out-of-state placements, both for the reasons relating to the fiscal integrity of the state as well as the hesitancy to remove juveniles to locations which might be far removed from their fami-

5B, Section 5 of the Code, the "rehabilitative facilities for status offenders" section of the Code which was enacted in 1979, and called for the establishment and maintenance of one (1) or more rehabilitative facilities to be used exclusively for the lawful custody of status offenders, but has never been funded since its enactment sixteen years ago.

It is this Court's understanding that the Governor's office has not, to date, issued a final report on this subject.

28. Capacity limits are set either by statute or through licensing standards. Rehabilitative facilities for juvenile status offenders are limited by statute to housing only twenty children. W. Va. Code § 59–5B–5. Emergency shelters are subject to licensing regulations issued by the Office of Social Services.

29. We note that the *Coe* ruling does not address a circuit court's authority to order the placement of a juvenile to a facility at capacity; it merely addresses the authority of the facility to accept

additional juveniles upon the attainment of capacity. This distinction, while seemingly semantic, nonetheless underscores our position that *Coe* is not determinative of this case.

30. The memorandum is dated August 24, 1996, and was prepared by Nancy Chalhoub, Program Specialist, Interstate Compact, and is addressed to Harry Burgess as Director of the Office of Social Services. Of the information provided·in this memorandum regarding the 373 out-of-state placements, only 23 of those placements are for pure status offenders; 6 of the placements are for status offenders who are also substance abusers; and the remainder of the placements are for serious offenders.

31. Additional factors that may affect the circuit court's decision to place a juvenile in an out-of-state facility include the lack of in-state facilities offering treatment services; cost-effectiveness, as some may actually be less than some in-state placements; and geographical proximity to the juvenile's community.

lies and communities.[32] DHHR must recognize that the key to limiting or even ending these out-of-state placements is through the Department's development of in-state placement alternatives. We consequently hold that while a circuit court should give preference to in-state facilities for the placement of juveniles, if it determines that no in-state facility can provide the services and/or security necessary to deal with the juvenile's specific problems, then it may place the child in an out-of-state facility. In making an out-of-state placement, the circuit court shall make findings of fact with regard to the necessity for such placement.[33]

 Given our ruling in this case, we find that the circuit court did not abuse its authority in placing Steven B. in a facility which resulted in the facility exceeding its capacity of twenty individuals by one individual.[34] Accordingly, there is no basis for awarding a writ of prohibition in this case. *See State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977); *accord Myers v. Frazier*, 173 W.Va. 658, 319 S.E.2d 782 (1984). It is not necessary to further address the so-called "babysitting" issue raised in Justin B.'s case as that issue was rendered moot by the availability of emergency shelter placement. We do note, however, that Judge Frazier's directive, which required the Department to "sit" with Justin B. in the event shelter placement was unavailable, was prompted by the circuit court's valid concern that the child could not be properly supervised in his home and was likely to run away if permitted to remain there. It clearly is the Department's responsibility to receive, house, and protect juveniles ordered into its custody by circuit courts.

Based on the foregoing, the writ of prohibition sought by the DHHR is hereby denied and we further mandate DHHR to produce the 1996 annual report required by West Virginia Code § 49–5B–7(a) on or before January 31, 1997. Future annual reports should be submitted no later than December 31st of each calendar year.

Writ denied.

---

**32.** As Judge Frazier observed, we are talking about a population of juveniles who frequently have deeply rooted social and/or psychological problems, and who, as a result, need intensive rehabilitative intervention. In the non-status offender population of juveniles adjudicated delinquent, there is a far greater number of out-of-state placements. These frequently are juveniles who have committed arson, serious sexual offenses, and other violent crimes. The resources to deal with this type of juvenile offender in an effective manner simply have not been made available to the court system by DHHR and/or the Legislature.

**33.** We are hopeful that this will assist in creating a further record as to the inadequacy of in-state alternatives, and dispel the myth that courts choose expensive, out-of-state placements where good in-state alternatives exist.

**34.** We note that the record does not indicate for what length of time the Pressley Ridge facility was over capacity due to Steven B.'s placement there.