498 S.E.2d 35

**E.H., et al., Petitioners,**

v.

**MATIN, et al., Respondents.**

**FAYETTE–MONROE–RALEIGH–SUMMERS MENTAL HEALTH COUNCIL, INC., et al., Intervenors–Petitioners,**

v.

**STATE of West Virginia, et al., Respondents.**

**R.A.R. an Infant Under the Age of 18 Years Old, and on Behalf of All Those Similarly Situated, Intervenors–Petitioners,**

v.

**Gretchen LEWIS, Secretary of the Department of Health and Human Resources, Respondent.**

No. 23999.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 8, 1997.

Decided Nov. 21, 1997.

---

facilities only: (1) if in accord with the plan(s) of the juvenile's multidisciplinary team, or if not in accord with that plan(s), then (2) after the circuit court has made specific fact-based findings following an evidentiary hearing that the plan(s) of the juvenile's multidisciplinary treatment team is inadequate to meet the child's needs.

Circuit court's answer: YES

The facts are not in dispute and were stipulated by the parties below. R.A.R.[1] is a sixteen year old minor resident of Marion County, West Virginia. He is currently in the custody of the Department of Health and Human Resources (DHHR) and has been placed by the circuit court in an out-of-state facility. Psychological evaluations have arrived at varying diagnoses. One evaluation determined R.A.R. suffered from attention deficit hyperactivity disorder. R.A.R. has also been diagnosed as suffering from conduct disorder/oppositional defiant disorder, learning disability, substance abuse and dependence, and possible emotional problems.

R.A.R.'s mother sought treatment for R.A.R. at the Olympic Center in Preston County, West Virginia. While at the center, a psychological assessment recommended psychiatric consultation to determine if psychopharmacological treatment was needed for the attention deficit hyperactivity disorder. Also recommended were weekly counseling sessions with a drug and alcohol specialist and participation in Alcoholics Anonymous. R.A.R. did not receive this recommended treatment.

R.A.R. got into trouble for stealing money from his mother by using her ATM card and for fighting with his brother. In December 1995, R.A.R. was placed in Chestnut Ridge Hospital for thirty days and sentenced to two years probation for petit larceny and battery.

While attending day school at Chestnut Ridge Hospital, R.A.R. screened positive for marijuana. As a result, the circuit court sent R.A.R. to the Northern Regional Juvenile Detention Facility in Ohio County, West Virginia, for sixty days. That detention was to be followed by twenty-four hour detention

Daniel F. Hedges, James T. Sugarman, Charleston, for R.A.R.

Darrell V. McGraw, Jr., Attorney General, Barbara Baxter, Assistant Attorney General, Charleston, for Department of Health and Human Resources.

MAYNARD, Justice:

In this case we are presented with two certified questions from the Circuit Court of Kanawha County, West Virginia, regarding the utilization of multidisciplinary treatment teams when children are involved in delinquency proceedings.

The questions certified to this Court and the circuit court's answers are:

1. Whether multidisciplinary team assessments, plans, and service plan implementation must be developed pursuant to W.Va. Code § 49–5D–3.

Circuit court's answer: YES

2. Whether courts may specify direct placements of juveniles in out-of-state/area

---

1. Consistent with our practice, the juvenile involved in this case is identified only by initials.

*See In re Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

except to attend school. While detained at Northern Regional Juvenile Detention Facility, R.A.R. collapsed during a recreation period due to a rapid heartbeat. R.A.R. was diagnosed with tachardyia arrhythmia at the Ohio State University Heart Center in Columbus, Ohio.

While on probation, R.A.R. had an argument with his mother and ran away from home. One week later, he was taken from a friend's house and sent by the court to the Kanawha County Children's Home for one month. Upon release, R.A.R. was ordered to live with his grandparents outside Pittsburgh. While there, R.A.R. skipped school to visit with friends and returned to Pittsburgh by the end of the school day. As a result of this incident, the court sentenced R.A.R. to serve from fifteen months to two years confinement at High Plains Youth Center, a facility located in Brush, Colorado which is operated by the Rebound Corporation (Rebound).[2]

A petition for writ of habeas corpus and mandamus was filed with this Court on behalf of R.A.R. The circuit court then granted a motion to review R.A.R.'s disposition to Rebound. During that hearing, the court changed R.A.R.'s placement to George Junior Republic juvenile facility in Grove City, Pennsylvania.

R.A.R. did not receive a multidisciplinary treatment team assessment plan during the 1995 and 1996 placements. The record seems to indicate that a multidisciplinary treatment team was established for R.A.R. when he was placed at George Junior Republic; however, the court did not receive or consider information from the team once it was created. Rather, R.A.R.'s dispositions were based solely on the judgment of the circuit court and R.A.R.'s probation officer.

The Circuit Court of Kanawha County, in its order entered on February 10, 1997, considered the questions presented here and found the issue was not moot, even though R.A.R.'s placement had been changed from Rebound to George Junior Republic. The court reasoned that the possibility exists for the issue presented here to be repeated with a different juvenile. The court found "[t]his issue of first impression affects a large number of children in West Virginia and merits authoritative interpretation of this legislation by the West Virginia Supreme Court of Appeals." The two questions previously noted were thereby certified to this Court.

■ The circuit court's first certified question to this Court is framed as follows:

Whether multidisciplinary team assessments, plans, and service plan implementation must be developed pursuant to W.Va. Code § 49–5D–3 (1996).

■ The language of W.Va.Code § 49–5D–3[3] is mandatory and requires the DHHR to convene and direct treatment teams not only for juveniles involved in delinquency proceedings, but also for victims of abuse and neglect. This Court previously said, "It is

---

2. Rebound is a highly secure facility that serves a correctional, as opposed to rehabilitative, population. Rebound targets males, ages twelve to twenty who are violent offenders, sex offenders and/or arsonists.

3. W.Va.Code § 49–5D–3 (1996) states in pertinent part:

(a) On or before the first day of January, one thousand nine hundred ninety-five, a multidisciplinary treatment planning process shall be established within each county of the state, either separately or in conjunction with a contiguous county by the secretary of the department with advice and assistance from the prosecutor's advisory council as set forth in section four [§ 7–4–4], article four, chapter seven of this code.

Treatment teams shall assess, plan and implement a comprehensive, individualized service plan for children who are victims of abuse or neglect and their families when a judicial proceeding has been initiated involving the child or children and for children and their families involved in delinquency proceedings.

(b) Each treatment team shall be convened and directed by the child's or family's case manager. The treatment team shall consist of the child's custodial parent(s) or guardian(s), other immediate family members, the attorney(s) representing the parent(s) of the child, if assigned by a judge of the circuit court, the child, if the child is over the age of twelve, and if the child's participation is otherwise appropriate, the child, if under the age of twelve when the team determines that the child's participation is appropriate, the guardian ad litem, the prosecuting attorney or his or her designee, and any other agency, person or professional who may contribute to the team's efforts to assist the child and family.

well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board,* 171 W.Va. 445, 300 S.E.2d 86 (1982). The Legislature used the word "shall" in W.Va.Code § 49–5D–3; therefore, West Virginia's fifty-five counties are not granted the discretion to determine whether they will establish treatment teams. W.Va.Code § 49–5D–3 is patently clear that this is a mandatory duty.

The original obligation to coordinate treatment teams was first set forth by this Court in the case of *In the Interest of Carlita B.,* 185 W.Va. 613, 408 S.E.2d 365 (1991). At that time this Court said:

> The formulation of the improvement period and family case plans should therefore be a consolidated, multidisciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family. The goal should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result.

*Id.* at 625, 408 S.E.2d at 377 (footnote omitted). The multidisciplinary treatment planning process was later mandated by statute and the process is now set forth in W.Va. Code § 49–5D–3.

The purpose of multidisciplinary treatment teams is stated in the statute itself. W.Va. Code § 49–5D–1(a) (1996) provides in pertinent part:

> The purpose of this article is ... to establish, as a complement to other programs of the department of health and human resources, a multidisciplinary screening, advisory and planning system to assist courts in facilitating permanency planning, following the initiation of judicial proceedings, to recommend alternatives

and to coordinate evaluations and in-community services.

The treatment planning process was statutorily mandated to be established in each county by January 1, 1995. Once the process is in place, the treatment teams are directed to "*assess, plan* and *implement*" comprehensive, individualized service plans for the children they serve.[4] The comprehensive plan includes child case plans and family plans.

The makeup of the team is also mandated by statute. The child's or family's case manager convenes and directs the team. Other members include

* the child's custodial parent(s) or guardian(s)

* other immediate family members

* attorney(s) representing the parent(s) of the child if assigned by a judge of the circuit court

* the child

 (a) if child is over the age of 12 and if child's participation is otherwise appropriate

 (b) if child is under 12, when team determines child's participation is appropriate

* the guardian ad litem

* prosecuting attorney or prosecuting attorney's designee

* any other agency, person or professional who may contribute to the team's efforts to assist the child and family.

W.Va.Code § 49–5D–3(b) (1996).

The treatment team is mandated to coordinate their activities with local family resource networks as well as with regional child and family service planning committees. This is "to assure the efficient planning and delivery of child and family services on a local and regional level." W.Va.Code § 49–5D–3(c) (1996). There is no statutory requirement that mandates how often a treatment team must meet, but the team must justify the basis for not reviewing a given child's case if the case is not reviewed every six months. W.Va.Code § 49–5D–4 (1994).[5]

---

**4.** *See supra* note 4 for the relevant language of W.Va.Code § 49–5D–3.

**5.** W.Va.Code 49–5D–4 (1994) states in pertinent part:

Notwithstanding the clear statutory mandates, R.A.R. did not receive an assessment or a service plan prior to the petition in this case being filed in this Court. By failing to follow the statutes, the DHHR has failed to fulfill its statutorily mandated role in R.A.R.'s disposition. The statutes indicate the multidisciplinary team plays a fundamental role in juvenile placements. We therefore hold that multidisciplinary treatment team assessments and individualized service plans must be developed and implemented pursuant to W.Va.Code § 49–5D–3. Accordingly, we answer the first certified question affirmatively.

The second certified question, as set forth above, is as follows:

Whether courts may specify direct placements of juveniles in out-of-state/area facilities only: (1) if in accord with the plan(s) of the juvenile's multidisciplinary team, or if not in accord with that plan(s), then (2) after the circuit court has made specific findings of fact, following an evidentiary hearing that the plan(s) of the juvenile's multidisciplinary treatment team is inadequate to meet the child's needs.

■■■ The parties do not question the authority of circuit courts to place juveniles who are adjudicated delinquent. In fact, the parties acknowledge that this Court has specifically stated, "West Virginia Code § 49–5–13(b) (Supp.1996) expressly grants authority to the circuit courts to make facility-specific decisions concerning juvenile placements." Syllabus Point 1, *State v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (1996). However, the Legislature has also said it is the duty of multidisciplinary treatment teams to provide courts with the information that is necessary to make an informed decision as to which facility can best meet a juvenile's needs. The DHHR must "assist the court in making its placement determination by providing the court with full information on placements and services available both in and out of the community. It is the court's responsibility to determine the placement." Syllabus Point 3, in part, *State v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (1996).

■■■ We pause here to note that juvenile out-of-state placements cost West Virginia huge sums of money every year.[6] Also, this Court has previously stated that out-of-state placements are not favored. We realize that it is very difficult, if not impossible, to provide needed family counseling when a child is placed hundreds or thousands of miles away from home and family. These long-distance placements have detrimental emotional effects on children. Therefore, we reiterate this Court's previous holding in syllabus point 6 of *State v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (1996):

While a circuit court should give preference to in-state facilities for the placement of juveniles, if it determines that no in-state facility can provide the services and/or security necessary to deal with the juvenile's specific problems, then it may place the child in an out-of-state facility. In making an out-of-state placement, the circuit court shall make findings of fact with regard to the necessity for such placement.

That directive remains intact, we are not altering it. Rather, we are expanding it to include the requirement of individualized service plans. If the lower court is going to depart from the recommendations of the multidisciplinary treatment team and thereby place juveniles in out-of-state facilities, then the court must hold a full evidentiary hearing on the adequacy of the individual service plan and the report of the multidisciplinary team. Following the hearing, and before any out-of-state placement can occur, the court must make specific written findings of fact in the dispositional order which set forth with particularity which provisions of

All persons directing any team created pursuant to this article shall maintain records of each meeting indicating the name and position of persons attending each meeting and the number of cases discussed at the meeting, including a designation of whether or not that case was previously discussed by any multidisciplinary team.... All treatment teams shall maintain a log of all cases to indicate the basis for failure to review a case for a period in excess of six months.

6. The cost for out-of-state placements in the county where this proceeding originated was $5,828,278.15 last year.

the service plan should not be followed and why.

 Sending children to an out-of-state facility is strongly disfavored for many reasons. Aside from the cost, which is after all, a legitimate consideration, other important factors weigh heavily against long-distance placements. These include separation from parents and siblings, the loss of emotional support from the extended family, the inability to have meaningful family counseling, and simply the loss of visitation and regular family contact. Accordingly, we believe an out-of-state placement should usually be the disposition of last resort for a child.

In the case of R.A.R., the record indicates that no realistic goals were developed and no service plan was instituted. Here is a juvenile with possible substance abuse problems, a learning disability, and emotional problems who was accused in the court system of nothing more than stealing from his mother and fighting with his brother. Nonetheless, the child was ordered by the court to be placed in a highly secure correctional institution over fifteen hundred miles from his home. If a multidisciplinary treatment team had been convened and had provided the court with information regarding the needs and capabilities of R.A.R., perhaps R.A.R. would have initially been placed at George Junior Republic.

For the foregoing reasons, we find that the institution of multidisciplinary treatment teams is statutorily mandated when a juvenile is adjudicated delinquent or is found to be a victim of abuse and neglect. We agree with the Circuit Court of Kanawha County that once a treatment plan is in place for a juvenile, if the court chooses not to follow the plan and places a child in an out-of-state facility, then the court must hold an evidentiary hearing and make specific findings of fact which explain why the plan was not followed.

Certified questions answered.

WORKMAN, C.J., concurs, and reserves the right to file a concurring Opinion.