500 S.E.2d 890

STATE of West Virginia ex rel. Joan E. OHL, Secretary of the West Virginia Department of Health and Human Resources, Petitioner,

v.

Honorable L.D. EGNOR, Jr., Judge of the Circuit Court of Cabell County, and Bryant E.W., Respondents.

No. 24367.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 7, 1997.

Decided Dec. 17, 1997.

Darrell V. McGraw, Jr., Attorney General, Charlene A. Baughan, Deputy Attorney General, Charleston, for Petitioner.

John M. Hedges, Byrne & Hedges, Morgantown, for Respondent, The Honorable L.D. Egnor, Jr.

Steven T. Cook, Stapleton Law Offices, Huntington, for Respondent, Bryant E.W.

Catherine D. Munster, Chairperson for Amicus Curiae, Child Placement Alternatives Corporation.

Robert E. Wilkinson, Chief Public Defender, Huntington, for Amici Curiae, Public Defenders of the 6th and 24th Judicial Circuits.

Jane Moran, Williamson, Amicus Curiae.

DAVIS, Justice:

In this original proceeding for a writ of prohibition, the petitioner, Joan E. Ohl, in her capacity as Secretary of the West Virginia Department of Health and Human Resources, requests this Court to prohibit the respondent, the Honorable L.D. Egnor, Jr., Judge of the Circuit Court of Cabell County, from taking any action to enforce his order of August 29, 1997, and his ruling of September 3, 1997. The challenged order and ruling required the Department of Health and Human Resources to place a juvenile, who had previously been adjudicated delinquent and had been placed in the legal and physical custody of the Department, at an out-of-state military school with all costs payable by the Department. We issued a rule to show cause. Because we find that the relevant statute did not afford Judge Egnor the authority to make such a placement, we now grant as moulded the writ of prohibition.

## I.

### FACTUAL AND PROCEDURAL HISTORY

This case arises from juvenile proceedings involving Bryant W.[1] The record indicates that Bryant was brought within the juvenile jurisdiction of the Circuit Court of Cabell County in 1992, by virtue of a juvenile petition filed by the elementary school he was then attending. The petition was not included in the record before this Court, but it apparently alleged that Bryant W. failed to regularly attend school, and also failed to obey school rules when he did attend. The Honorable Judge L.D. Egnor, Jr., has pre-

sided over this juvenile action. By Judge Egnor's order entered on January 27, 1993, Bryant W. was adjudicated delinquent. He was eleven years old at that time. The court awarded legal custody to the Department of Health and Human Resources [hereinafter "DHHR"], with physical custody to remain with Bryant W.'s mother.

Thereafter, a DHHR caseworker prepared a summary of Bryant W.'s background to assist Judge Egnor in determining what actions would be in the best interest of Bryant. The summary concluded by recommending six months of in-home intervention services. A psychological evaluation similarly suggested in-home intervention, but stated further that placement in a group home might be appropriate if in-home intervention did not produce significant improvement. A disposition hearing was held on February 25, 1993. Following this hearing, by order entered March 9, 1993, the circuit court ordered that physical custody of Bryant W. be transferred to his step-father.[2] In addition, the court ordered in-home intervention services. A second order, entered March 12, 1993, also resulted from the February 25, 1993, disposition hearing. In that order, the circuit court placed Bryant on probation for one year. The court enumerated specific conditions of probation, which included the requirement that Bryant W. attend school and comply with all school rules and regulations.

Bryant W. continued to miss school and violate school rules. Consequently, following a modification hearing held on November 3, 1993, the court again adjudicated Bryant a delinquent child and extended his probation for a period of six additional months. The court also transferred physical custody of Bryant back to his mother, and ordered in-home intervention and counseling for Bryant.

Bryant's behavior did not improve and a second modification hearing was held on February 7, 1994. Following the hearing, the court once again adjudicated Bryant a delinquent child. Bryant's probation was ex-

---

1. We follow our past practice in domestic and juvenile cases involving sensitive facts and do not use the last names of the parties. *See, e.g., State ex rel. Amy M. v. Kaufman,* 196 W.Va. 251, 254 n. 1, 470 S.E.2d 205, 208 n. 1 (1996).

2. Bryant's stepfather did not reside with Bryant's mother.

tended indefinitely and physical custody was awarded to the DHHR for placement at Stepping Stones Group Home.

Thereafter, on June 19, 1995, the circuit court held a hearing to ascertain whether Bryant should be released from Stepping Stones Group Home. At that hearing, the court determined that Bryant had satisfactorily completed the rehabilitation program at Stepping Stones based upon information provided by Bryant's probation officer, Michael Lacy. Consequently, Bryant was released from the home and physical custody was returned to his mother, although legal custody remained with the DHHR. In addition, the court modified the previously imposed indefinite term of probation to a term of one year.

An agreed order dismissing the juvenile matter was subsequently entered on March 1, 1996. Bryant's term of probation, however, apparently continued as earlier ordered. Shortly thereafter, a third modification hearing was held on April 4, 1996, during which the court determined that Bryant had violated the terms and conditions of his probation. Bryant was once again placed at the Stepping Stones Group Home, and his probation was extended to run concurrently with such placement. As one of the conditions of his probation, Bryant was ordered to refrain from associating with any member of a particular street gang. While the record does not contain specific details, we infer from this restriction that Bryant had become somehow involved with this gang.

At a subsequent release hearing held on July 8, 1997, the circuit court was informed that Bryant had satisfactorily completed his second rehabilitation program at Stepping Stones. Consequently, the court ordered that physical custody of Bryant be awarded to his step-father, with a three month program of aftercare provided by Stepping Stones. In addition, Bryant's term of probation was extended to June 10, 1998.

According to a February 28, 1997, entry in a recording log created by the DHHR social worker assigned to Bryant's case, Bryant had expressed a desire to attend military school. The recording log indicates that this possibility was at least mentioned during the release hearing of July 8, 1997. The log further indicates that on July 24, 1997, the social worker investigated the prospect of getting approval for Bryant to attend military school.[3] An August 11, 1997, entry in the log stated that the social worker had obtained a verbal "OK" to pursue military school, and the worker had instructed Bryant to schedule an interview with one such school. Although the recording log does not indicate the location of the school, the parties submit that the school was located out-of-state. Ultimately, arrangements for placement could not be completed at this school because it would not accept tuition payments on a monthly basis, and, in addition, it declined to accept Bryant due to his history of juvenile court involvement. There is no indication in the recording log that any efforts were made to locate an in-state placement for Bryant, other than an entry stating "Bryant not allowed back in Huntington or at [Huntington High School] due to recent gang contacts."

An August 13, 1997, entry in the recording log indicated that Bryant was either associating with the previously mentioned street gang, or that the gang was threatening Bryant's friends. At a hearing on August 21, 1997, the circuit court was apprised of the failure to get Bryant into the military school previously discussed. Therefore, Bryant was temporarily placed at Stepping Stones pending a review hearing later that month. Also during the August 21 hearing, Bryant's counsel requested permission to work with Bryant to locate a military school that would accept a state agency contract. Judge Egnor consented to this request.

At the subsequent review hearing, held on August 28, 1997, Judge Egnor ordered that Bryant be placed at an out-of-state military school[4] at which he had been accepted.

---

**3.** Presumably, the social worker needed approval from her superiors to pursue the prospect of recommending such an unconventional placement to the circuit court.

**4.** We decline to disclose the school's name or specific location. Instead, we will refer to it as "the military school" or "the school," in further-

Judge Egnor ordered that all costs of the placement be paid by the DHHR. The total cost of placement at this military school was determined to be $1,555.56 per month, which is $55.56 *per diem.* No objections were made to this order. The DHHR Social Worker was present at the hearing, as was an assistant prosecuting attorney for Cabell County; however, the DHHR argues that the assistant prosecuting attorney was not representing the DHHR's interests at this hearing. Thereafter, the DHHR entered into negotiations with the school regarding the school's contract. Ultimately, the DHHR drafted its own contract, which was accepted by the school. However, the contract was not signed by the DHHR, and Bryant was not transported to the school. The DHHR contends that, in redrafting the contract, it inadvertently included a provision for which the state could not lawfully contract.[5] However, the school maintained that it would not accept the contract without this provision.

On September 3, 1997, Counsel for Bryant W. learned that Bryant had not been transferred to the military school. During a conversation between Bryant's counsel and a DHHR representative earlier that day, the DHHR expressed that it desired an additional twenty-four hours to investigate in-state placement for Bryant. The military school's term had already begun, and the enrollment deadline was September 4, 1997, the day after this conversation. Thus, if Bryant was not at the school by the following day, his opportunity to attend would be lost. Accordingly, a review hearing was held on September 3, at the request of Bryant W.'s counsel.

Initially, those present for the hearing included Bryant's counsel, the Cabell County Prosecuting Attorney, and Bryant's Probation Officer. In addition, Counsel for the DHHR was present via telephone. At this hearing, counsel for Bryant W. informed the court that Bryant had not been placed at the

military school per the court's previous order and that the DHHR was now resisting the placement. Counsel for the DHHR stated, during her response to these comments, that Jennifer Plymale, Commissioner of the Children and Families Division of the DHHR, was present with counsel via the telephone. Judge Egnor then ordered Ms. Plymale to appear in his office in one hour, and adjourned the proceedings pending her appearance.

Commissioner Plymale appeared as ordered and was accompanied by Joan Ohl, Secretary of the DHHR, whereupon the proceedings were reconvened. The DHHR, through its counsel, requested the court to reconsider its order, which had been announced at the hearing of August 28, 1997, and entered on August 29, 1997, directing that Bryant be placed at the out-of-state military school. Thereafter, the DHHR presented evidence in support of its motion.

Secretary Ohl was among those offering testimony at the hearing. She stated that during a phone conversation with Bryant's counsel at 11:30 a.m. on that very day, she requested twenty-four hours to look for a placement for Bryant within the State. She expressed that placing Bryant within the State would be much more cost effective than the military school option. She contended that the DHHR did not have funds with which to pay the military school. In response to Judge Egnor's inquiry regarding the source of funds to pay for an in-state alternative, Secretary Ohl explained that all of the funds to send Bryant to the military school would come from the State's general revenue fund. Alternatively, the cost of in-state facilities could be split between the general revenue fund and the Medicaid budget. Thus, she opined that in-state placement, while more expensive overall, would require less funding from the general revenue. Secretary Ohl explained further that the DHHR funds are appropriated on a

---

ance of our practice of protecting the identity of juveniles such as Bryant. *See supra* note 1.

**5.** In her brief, Secretary Ohl stated that the controverted provision required full payment of the entire cost of nine months of schooling in the event that Bryant quit or was dismissed from the

school prior to the completion of the school year. During oral argument, however, counsel for Secretary Ohl stated that the controverted provision required monthly payments in advance of services rather than monthly payments after services had been rendered.

monthly basis. Although the September appropriation for social services had already been expended, Secretary Ohl stated, new funds would be available on the first day of October. However, according to Secretary Ohl, such funds typically are exhausted by the eighth day of every month.[6]

Commissioner Plymale also testified at the hearing. She emphasized that the DHHR had a duty to be responsible with state funds, and she felt it was fiscally irresponsible to enter a contract that the DHHR could not meet financially. After hearing the testimony presented by all the parties, Judge Egnor denied the DHHR's motion to reconsider and ordered Secretary Ohl to sign the contract to secure Bryant's admission to the military school, and further ordered the DHHR to transport him to the school on or by September 4, 1997. Bryant was subsequently transported to the school and is, by all accounts, thriving there.

On the day following the hearing, Secretary Ohl filed this petition for a writ of prohibition praying that this Court issue a rule to show cause why a writ of prohibition should not be awarded by this Court prohibiting the respondent, Judge Egnor, from taking any action to enforce his order of August 29, 1997, and his ruling of September 3, 1997.[7] We issued a rule to show cause and now grant the writ as moulded.[8]

## II.

## DISCUSSION

### A.

### *Writ of Prohibition*

■■■ We have stated the general rule with respect to the propriety of the extraordinary remedy of prohibition as follows: "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W.Va.Code*, 53–1–1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977). The speedily filed brief in the instant case is not a model of clarity. However, we perceive that Secretary Ohl does not challenge Judge Egnor's jurisdiction over the juvenile proceeding. Rather, we interpret Secretary Ohl's argument to be that Judge Egnor exceeded his legitimate powers, in

**6.** We note at this juncture that, although Secretary Ohl opined that in-state placement would require less funding from the general revenue fund, evidence submitted to this Court by Counsel for Bryant W. reveals that payment of the military school tuition actually requires *less* funding from the general revenue than does the DHHR's proposed alternative. According to Secretary Ohl's brief, the DHHR proposes to send Bryant W. to the Davis Stuart group home in Princeton, West Virginia. A letter from the business manager of the Davis Stuart, Inc., organization stated that the total *per diem* fee for the their group homes is $162.91. The portion of that total paid by Medicaid equals $48.73. The remaining $114.18 is paid from the general revenue fund. By contrast, as previously stated, the military school's *per diem* tuition, which must be paid entirely from the general revenue fund, is only $55.56.

**7.** Following the petition for a writ of prohibition and the issuance of the rule to show cause, an order reflecting Judge Egnor's September 3, 1997, ruling, and containing findings of fact and conclusions of law, was entered in the Circuit Court of Cabell County on September 11, 1997.

**8.** We highly commend Judge Egnor, Michael Lacy, Bryant W.'s probation officer and Steven Cook, Bryant's attorney, for their efforts over the past five years in this juvenile case. If more of those individuals involved in juvenile cases were similarly dedicated, many of the problems with juvenile dispositions in this State would surely be resolved. In the case *sub judice*, Judge Egnor made a variety of attempts to mould a treatment plan that would address Bryant's problems and promote his best interests. During this period, Michael Lacy monitored Bryant's progress, or lack thereof, and requested modification hearings when necessary. After trying numerous community-based and in-state placement alternatives, Judge Egnor finally implemented a treatment plan that incorporated a private military school located by Bryant's attorney. Based upon his experiences with Bryant, Judge Egnor believed there was a high probability that Bryant would be successful at the school. Indeed, we find no grounds upon which to criticize the quality of the facility chosen by Judge Egnor. However, we are bound to enforce the constitutional laws established by the Legislature, and, as hereinafter explained, we must conclude that a private military school simply does not comport with the notion of a rehabilitative facility as contemplated by the Legislature in W.Va.Code § 49–5–13(b)(6).

violation of W.Va.Code 49–5–13(b)(6), by ordering that Bryant W. be placed in a private military school located outside of this state.[9] In this regard, we have stated:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996). Moreover, we have explained that "[m]andamus, prohibition and injunction against judges are drastic and extraordinary remedies.... As extraordinary remedies, they are reserved for really extraordinary causes." *State ex rel. Suriano v. Gaughan,* 198 W.Va. 339, 345, 480 S.E.2d 548, 554 (1996) (internal quotations and citations omitted). After thoroughly reviewing the evidence submitted in this case, and the parties' arguments, we find prohibition is appropriate and grant the writ.

**9.** Secretary Ohl briefly argued additional grounds for asserting that Judge Egnor exceeded his authority. Because we resolve this case based upon our interpretation of W.Va.Code § 49–5–13(b)(6), we need not address those additional grounds.

**10.** At the time of the relevant statute, the term "juvenile delinquent" referred to juveniles who had committed criminal acts as well as certain

### B.

### *Juvenile Placement in Private School Outside of West Virginia*

Petitioner argues that the circuit court abused its power in violation of W.Va.Code § 49–5–13(b)(6) (1995) (Repl.Vol.1996) by ordering the DHHR to place a juvenile in a private military school located outside of West Virginia. We agree.

■ When unfortunate circumstances require that a juvenile be removed from his or her home, it is the circuit courts that determine where the juvenile shall be placed. This point was made abundantly clear in our recent decision in *State ex rel. W. Va. DHHR v. Frazier,* 198 W.Va. 678, 482 S.E.2d 663 (1996), where we held in Syllabus point 1: "West Virginia Code § 49–5–13(b) (Supp. 1996) expressly grants authority to the circuit courts to make facility-specific decisions concerning juvenile placements."

However, this authority is not without limitation. W.Va.Code § 49–5–13 contains the provisions regarding disposition of juvenile delinquents, including status offenders.[10] Bryant W. is classified as a status offender as he has not committed an offense that would be a crime if committed by an adult. Specific provisions for the disposition of status offenders such as Bryant W. are found in W.Va.Code § 49–5–13(b)(6) (1995) (Repl.Vol. 1996), which states:

> (b) Following the adjudication, the court shall conduct the dispositional proceeding, giving all parties an opportunity to be heard. In disposition the court shall not be limited to the relief sought in the petition and shall, in electing *from the following alternatives,* consider the best interests of the child and the welfare of the public:

non-criminal acts. *See* W.Va.Code § 49–1–4 (1978) (Repl.Vol.1996). Juvenile delinquents who had committed only the specified non-criminal act(s) were commonly referred to as "status offenders." During 1997, the child welfare provisions of the West Virginia Code were amended. Presently, a "status offender" is no longer included within the definition of a "juvenile delinquent." *See* W.Va.Code § 49–1–4(8) & (14) (1997) (Supp.1997).

. . . .

(6) Upon an adjudication of delinquency pursuant to subdivision (3) or (4), section four [§ 49–1–4(3) or (4) ], article one of this chapter,[11] and upon a finding that the child is so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration, commit the child to *a rehabilitative facility devoted exclusively to the custody and rehabilitation of children adjudicated delinquent pursuant to said subdivision.* Commitments shall not exceed the maximum period of one year with discretion as to discharge to rest with the director of the institution, who may release the child and return him or her to the court for further disposition. The order shall state that continuation in the home is contrary to the best interests of the child and why; and whether or not the state department made a reasonable effort to prevent the placement or that the emergency situation made such efforts unreasonable or impossible[.]

(Emphasis added) (footnote added).

■ When the language of a statute is clear and unambiguous, we apply the statute without resorting to the rules of statutory construction. *See* Syl. pt. 5, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) (" ' " 'Where the language of a statute is clear and without ambiguity

the plain meaning is to be accepted without resorting to the rules of interpretation.' Syl. pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968)." Syllabus point 1, *Courtney v. State Dept. of Health of West Virginia,* 182 W.Va. 465, 388 S.E.2d 491 (1989).' Syllabus point 3, *Francis O. Day Company, Inc. v. Director, Division of Environmental Protection,* 191 W.Va. 134, 443 S.E.2d 602 (1994)."). We believe the language of W.Va. Code § 49–5–13(b)(6) is clear. In juvenile dispositions, the circuit court is limited, under the first paragraph of W.Va.Code § 49–5–13(b), to choosing from the enumerated alternatives contained therein. Therefore, we hold that, while W.Va.Code § 49–5–13(b) expressly grants authority to the circuit courts to make facility-specific decisions concerning juvenile placements, that authority is not without limitation. Rather, the circuit courts must choose from the alternatives provided in W.Va.Code § 49–5–13(b) in selecting appropriate juvenile placements.

■ In the case *sub judice,* the relevant alternative is found in W.Va.Code § 49–5–13(b)(6). Pursuant to that section, upon a finding that a child who has been adjudicated delinquent is "so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration," [12] a circuit court may "commit the child to *a rehabilitative facility devoted exclusively to the custody and rehabilitation of children adjudicated delinquent pursuant to said subdivision.*" [13] The ques-

11. W.Va.Code § 49–1–4 (1978) (Repl.Vol.1996) defines a "delinquent child." Subsections (3) and (4) of W.Va.Code § 49–1–4 state that a "delinquent child" is a child: "(3) Who, without just cause, habitually and continually refuses to respond to the lawful supervision by such child's parents, guardian or custodian; [or] (4) Who is habitually absent from school without good cause."

12. In her brief, Secretary Ohl asserts that W.Va. Code § 49–5–13(b)(6) does not apply to Bryant W. because the circuit court failed to find that Bryant was "so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration." We disagree. The court's lengthy order, which had not yet been entered at the time Secretary Ohl filed her petition with this Court, contained detailed findings of fact regarding Bryant, although it did not specifically state that Bryant was "so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration." While the better course would have been for the circuit court to have made a specific finding in this

regard, we can easily infer this conclusion from the exhaustive findings made by the court.

We note that under the 1997 amendments to the Child Welfare provisions of West Virginia Code, such a finding is no longer required. *See, e.g.,* W.Va.Code § 49–5–11a (1997) (Supp.1997) (addressing disposition of status offenders).

13. Under the 1997 revisions to the Child Welfare statutes, disposition of status offenders is addressed in W.Va.Code § 49–5–11a (1997) (Supp. 1997). The provisions no longer provide a specific list of placement alternatives, and no longer require that a juvenile be placed in a rehabilitative facility. While the new provisions encourage circuit courts to make placements at community based facilities, they grant to the courts broader discretion in determining the precise placement that will meet the best interests of the juvenile and the community. *See* W.Va.Code § 49–5–11a(2)(c) ("The court shall not be limited to the relief sought in the [DHHR's] petition and shall make every effort to place juveniles in community based facilities which are the least restrictive alternatives appropriate to the needs of the juvenile and the community.").

tion we must answer, then, is whether a private military school is a rehabilitative facility.[14] We find that it is not.

The Legislature has addressed what is contemplated by the term "rehabilitative facility" in the context of directing the DHHR to establish and maintain such facilities. In this regard, the Legislature has identified a "rehabilitative facility" as:

> primarily, a nonsecure facility having as its *primary purpose the rehabilitation of adjudicated juvenile offenders who are status offenders.* Such facility shall not have a bed· capacity for more than twenty children, and shall minimize the institutional atmosphere and *prepare the child for reintegration into the community* ... [A] portion of such facility may be designed and operated as a secure facility used exclusively for status offenders whom the juvenile court has specifically found to be so unmanageable, ungovernable and anti-social that no other reasonable alternative exists, or could exist, for treatment or restraint other than placement in a secure facility.

W.Va.Code § 49–5B–5(a) (1979) (Repl.Vol. 1996) (emphasis added). Thus, the primary goal of a rehabilitative facility for status offenders, as contemplated by the Legislature, is to rehabilitate. In this context, the term rehabilitate is generally understood as meaning "to restore to a useful and constructive place in society through social rehabilitation." *Webster's Third New International Dictionary of the English Language Unabridged* 1914 (1970). *See also State ex rel. R.S. v. Trent,* 169 W.Va. 493, 508, 289 S.E.2d 166,

175 (1982) ("The child welfare law clearly contemplates that the rehabilitation of delinquent children shall be accomplished by a program of individualized care and treatment directed towards the ultimate goal of reintegrating such children into society so that they no longer pose a threat to themselves or to the public.") We do not believe that a private military school meets the requirements outlined above. While some services provided by a private military school may address, on some level, the goals contemplated by the Legislature, we believe the primary focus of a private military school is education provided in a military atmosphere, not rehabilitation. We do not believe such a school is equipped to address the special needs of juveniles who have been adjudicated "juvenile delinquents" or "status offenders," *i.e.,* to provide a juvenile with needed social services and to prepare him or her for reintegration into the community. Notably, Bryant W. was rejected by one military school due to his history of court intervention, and the military school that ultimately accepted him did so in exception to its general policy.[15] Therefore, we hold that a private military school does not fall within the meaning of a rehabilitation facility as contemplated by the Legislature in W.Va.Code § 49–5–13(b)(6).

Because we find that a private military school is not a rehabilitation facility as contemplated by the Legislature in W.Va.Code § 49–5–13(b)(6), we conclude that the circuit court exceeded its authority under that statute when it ordered the DHHR to place a juvenile in a private military school.[16]

---

**14.** The requirement that the rehabilitative facility be devoted exclusively to the custody of children adjudicated delinquent speaks to the prohibition against housing status offenders in the same facility with juveniles adjudicated delinquent as a result of criminal activity. *See* Syl. pt. 1, *State ex rel. C.A.H. v. Strickler,* 162 W.Va. 535, 251 S.E.2d 222 (1979) ("'Under no circumstances can a child adjudged delinquent because of a status offense, i.e., an act which if committed by an adult would not be a crime, be incarcerated in a secure, prison-like facility with children adjudged delinquent because of criminal activity.' Syl. pt. 4, *State ex rel. Harris v. Calendine,* [160] W. Va. [172], 233 S.E.2d 318 (1977)."). *See also* W.Va.Code § 49–5–13(b)(6) (1978) (Repl.Vol. 1980) (including for the first time, in statutory amendments that succeeded this Court's holding in *Harris v. Calendine,* language that a child must

be committed to a facility "devoted exclusively to the custody and rehabilitation of children adjudicated delinquent [under statutory provisions related to non-criminal acts]....").

**15.** We in no means assert that Bryant W. does not possess the qualifications for admission to a private military school. Clearly he does and has been so accepted. We conclude only that such a school does not provide the rehabilitative services contemplated by the Legislature in W.Va. Code § 49–5–13(b)(6).

**16.** Secretary Ohl also briefly argued that Judge Egnor deprived her of due process by eliminating her right to appeal his order. Because we have granted the relief requested by Secretary Ohl, we need not reach this issue.

[redacted] Although we have resolved the substantive issue in this case, there are two additional points that should briefly be addressed. First, much has been made of the fact that Bryant W. was placed in a facility located outside of this State. This fact, in and of itself, lends nothing to the resolution of this case. We have stated, on more than one occasion, that when a juvenile must be placed outside the home, in-state facilities should be favored, but placement at an in-state facility is not necessarily mandatory:

> While a circuit court should give preference to in-state facilities for the placement of juveniles, if it determines that no in-state facility can provide the services and/or security necessary to deal with the juvenile's specific problems, then it may place the child in an out-of-state facility. In making an out-of-state placement, the circuit court shall make findings of fact with regard to the necessity for such placement.

Syl. pt. 6, *State ex rel. W. Va. DHHR v. Frazier*, 198 W.Va. 678, 482 S.E.2d 663.[17] Dispositions must be made in the best interests of the juvenile, and when there is no in-state facility that meets a juvenile's particular needs, a circuit court may order an out-of-state placement upon making the requisite findings of fact. While we recognize that far too many juveniles are being unnecessarily placed in facilities outside of this State, we caution the DHHR and the circuit courts that, in making their respective recommendations and dispositions, they should be mindful of their duty to provide for the best interests of the child and the community. A juvenile should not be placed at an in-state facility that does not meet his or her needs simply for the sake of making an in-state placement. We make no determination regarding the proper placement of Bryant W.; that decision is appropriately left to the circuit court. We simply emphasize that, in our zeal to curb the increasing number of out-of-state placements, we should not lose sight of the fact that dispositions must be consistent with the best interests of the juvenile. *See* W.Va. Code § 49–1–1 (1981) (Repl.Vol.1996); W.Va. Code § 49–5–13(b). *See also* Syl. pt. 4, *State ex rel. B.S. v. Hill*, 170 W.Va. 323, 294 S.E.2d 126 (1982) ("'All officers and employees of the State charged with implementing the provisions of the juvenile law are required to act in the best interests of the child and the public in establishing an individualized program of treatment for each child adjudged delinquent.' Syllabus Point 7, *State ex rel. R.S. v. Trent*, 169 W.Va. 493, 289 S.E.2d 166 (1982).").

[redacted] Finally, we wish to comment on the conduct of the DHHR in this case. We have held:

> Once a circuit court adjudicates a child delinquent pursuant to West Virginia Code § 49–1–4(3) or –(4) (1995) and finds that the child is so totally unmanageable, ungovernable and antisocial that the child is amenable to no treatment or restraint short of incarceration, then *it is the responsibility of the West Virginia Department of Health and Human Resources to assist the court in making its placement determination by providing the court with full information on placements and services available both in and out of the community.* It is the court's responsibility to determine the placement.

Syl. pt. 3, *Frazier*, 198 W.Va. 678, 482 S.E.2d 663 (emphasis added). Moreover, we have recently recognized that "[t]he language of W.Va.Code § 49–5D–3 [(1996) (Repl.Vol. 1996)] is mandatory and requires the De-

17. More recently, we held that:

> Circuit courts may specify direct placements of juveniles in out-of-state facilities only: (1) if in accord with the plan(s) of the juvenile's multidisciplinary team, or if not in accord with that plan(s), then (2) after the circuit court has made specific findings of fact, following an evidentiary hearing, that the plan(s) of the juvenile's multidisciplinary treatment team is inadequate to meet the child's needs.

Syl. pt. 5, *E.H. v. Matin*, 201 W.Va. 463, 498 S.E.2d 35 (1997). Unfortunately, Judge Egnor and Bryant W. did not receive the benefit of multidisciplinary treatment team recommendations in this case. However, such should not be the case in the future. In Syllabus point 3 of *Matin* we held that "[t]he language of W.Va.Code § 49–5D–3 is mandatory and requires the Department of Health and Human Resources to convene and direct treatment teams not only for juveniles involved in delinquency proceedings, but also for victims of abuse and neglect." *Id.*

partment of Health and Human Resources to convene and direct treatment teams not only for juveniles involved in delinquency proceedings, but also for victims of abuse and neglect." Syl. pt. 3, *E.H. v. Matin,* 201 W.Va. 462, 498 S.E.2d 35 (1997). In the case *sub judice,* the DHHR failed miserably in carrying out its duties to assist the court. Although the DHHR has come before this Court to vehemently protest Bryant W.'s placement at a private military school, we note that the DHHR made no alternative recommendations to the circuit court when that court was making its decision on the proper disposition for Bryant. Only after the circuit court made its decision, and just one day before the placement decided upon by the circuit court would have been permanently lost, did the DHHR notify the court of its intent to search for alternative placements to recommend to the court. Even at that late date, the DHHR had prepared no recommendations. In order to properly assist the children entrusted to its care, the DHHR must fulfill its mandatory duties in a timely fashion. Eleventh hour attempts to fulfill these duties, such as occurred in this case, are wholly inadequate, totally inconsistent with the DHHR's mandatory duties to assist the circuit courts in finding appropriate placements and contrary to the best interests of the children involved and the community.

## III.

## CONCLUSION

Because we find that a private military school does not fall within the meaning of a rehabilitation facility as contemplated by the Legislature in W.Va.Code § 49-5-13(b)(6), we find that the circuit court exceeded its authority under that statute when it ordered the Department of Health and Human Resources to place a juvenile in a private military school. Consequently, we grant the writ as moulded and prohibit the respondent, the Honorable L.D. Egnor, Jr., Judge of the Circuit Court of Cabell County, from taking any further action to enforce his order of August 29, 1997, his ruling of September 3, 1997, and his corresponding order of September 11, 1997.

Writ granted as moulded.