**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **A.W.**

**vs.)  No. 21-0352** (Greenbrier County (CC-13-2020-JD-7(B))

**MEMORANDUM DECISION**

Petitioner A.W., by counsel Martha J. Fleshman, appeals the Circuit Court of Greenbrier County's April 2, 2021, order following dispositional hearing, which committed petitioner to the custody of the Division of Juvenile Services upon the court's finding that he committed sexual abuse in the first degree. [1] Petitioner was ordered to remain in custody until he turns twenty-one, but the sentence was suspended and he was placed on probation. The order also placed petitioner at River Park Hospital for treatment. The State of West Virginia, by counsel Patrick Morrisey and Andrea Nease Proper, filed a response in support of the circuit court's order. Petitioner's appeal focuses on the fact that the circuit court placed him in a specific residential treatment facility he did not believe was the appropriate placement.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2020, the State filed a petition in the Circuit Court of Greenbrier County alleging that petitioner, then sixteen years old, sexually assaulted his adoptive sister, then nine years old, by inserting his penis into her vagina. The petition also alleged that petitioner committed two counts of sexual abuse against that adoptive sister by touching his penis to her vagina. The incidents were alleged to have occurred between February 1 and May 25, 2020. The petition requested that petitioner be adjudicated as a juvenile delinquent pursuant to West Virginia Code § 49-4-701.

According to the "West Virginia State Police WVDHHR Disposition Referral Disposition Report," in May of 2020, petitioner's guardian, K.S., saw petitioner and the sister leaving a room

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

together. The sister told the guardian that petitioner had bribed her to pull down her pants for him to look at her vagina, and the sister later admitted that petitioner penetrated her. In June of 2020, the sister underwent a forensic interview, during which she described several incidents, some of which resulted in penetration. Petitioner was also interviewed in June of 2020, but the questioning centered on whether petitioner had been victimized in the past. Petitioner repeatedly stated that he had done "a bunch of sexual abuse stuff," including with a "nine year old" because he "hear[d] voices in [his] head." In October of 2020, petitioner was examined by Dr. Clifton Hudson, a forensic psychologist, who produced a report describing petitioner's history in the foster care system and his history of neglect. Dr. Hudson also noted a history of behavioral issues and a contentious relationship between petitioner and his grandparents, who were his guardians. Dr. Hudson also found that petitioner was not sexually aggressive but did need sexual offender treatment. Dr. Hudson provisionally diagnosed petitioner with oppositional defiance disorder, anxiety disorder, and depressive disorder. He recommended that petitioner be placed in a structured familial or foster placement with careful supervision and intensive therapy, including sex-offender-specific treatment. Further, Dr. Hudson recommended that petitioner not be permitted to engage in unsupervised contact with younger children, in addition to his internet and phone usage being monitored.

On October 16, 2020, an initial Comprehensive Assessment and Planning ("CAPS") report was completed, detailing petitioner's history and the charges against him. Petitioner's functioning assessment score indicated that he "likely needs intensive treatment." Thereafter, a November 17, 2020, multidisciplinary team ("MDT") report detailed that petitioner was failing all but one of his high school classes. Petitioner was informed that there was only one in-state sex offender program and was given information on that program, which was at River Park Hospital ("River Park").

During a January 6, 2021, review hearing, Angela Narquini, petitioner's case manager at the group home/shelter where he was staying, stated that he was doing very well with minimal problems. Ms. Narquini also noted that a potential foster home had declined to accept petitioner for placement but that she had been in contact with Specialized Home Finders and River Park in an attempt to find a placement for petitioner following his ninety-day shelter stay. Petitioner's counsel stated that the psychologist recommended a foster placement with outpatient treatment, rather than inpatient treatment, and since there were issues finding such a placement, counsel requested that petitioner be permitted to remain in the shelter past the ninety-day limit. Counsel noted that she and petitioner preferred placement at an out-of-state facility rather than River Park, noting that counsel does "not have a good history and a good success rate with River Park."

At the time of the hearing, petitioner was seeing two therapists, Dr. Donald Kissinger (for sex offender specific therapy) and Brian Denaski (for depression, anxiety, anger, and other issues). The Department of Health and Human Resources ("DHHR") caseworker, Tara Mull, told the circuit court that she had been attempting to find a specialized foster placement because petitioner could only be placed with other young men around his age or be the only child in a home. She had contacted Specialized Home Finders and had been checking with it multiple times per week. Dustin Martin, petitioner's juvenile probation officer, pointed out to the court that finding a suitable foster home would be almost impossible due to the narrow parameters based on petitioner's age and sex offender status. Therefore, Mr. Martin suggested that a different backup plan was needed. He also noted that River Park was the only in-state facility dealing with sex

offenders and indicated his preference that petitioner be placed in such a residential placement. On the record, the court addressed the difficulty finding a placement, including the lack of a suitable kinship placement, and allowed petitioner to remain in the shelter while additional attempts were made to find a more appropriate placement. The court found that the DHHR was making reasonable efforts to find an appropriate longer-term placement. A January 29, 2021, order memorialized the circuit court's ruling during that hearing, finding that petitioner would remain in DHHR custody and that the MDT would continue to try to find a placement for petitioner.

During a February 9, 2021, hearing, the circuit court noted that petitioner had had an incident with a twelve-year-old at the shelter where he was placed, raising concern that he urgently needed a new placement without younger children present. Petitioner again objected to placement at River Park, but the caseworker indicated that she had contacted nine agencies without locating a potential foster placement for petitioner. She also informed the court that she had contacted regular and specialized foster homes without success. According to petitioner, his treating psychologist wanted him to be treated as an outpatient and his counsel feared that placement at River Park would place him with more predatory sexual offenders. However, the court noted that the psychologist's report did not provide that a residential facility would be inappropriate; instead, it indicated that residential treatment may be necessary if petitioner's sexualized behaviors continued, which is precisely what occurred.

After two MDT meetings in February of 2021, petitioner was accepted to River Park, though his counsel sought additional foster care referrals despite the fact they had not been fruitful. The MDT noted that petitioner's sexualized behaviors toward other children had become more frequent, reporting that he had been targeting children under age eleven at the shelter, including two incidents involving sexual comments. During a third MDT meeting, the team found that although petitioner had been accepted at Burlington United Methodist Family Services, a therapeutic treatment facility located in Beckley, West Virginia, that facility did not have specialized sex offender treatment. Petitioner complained that not enough was being done to find a foster home placement for him. The report from the third MDT meeting indicated that the DHHR was not allowed to consider out-of-state placement until all in-state options have been explored. On February 22, 2021, the DHHR wrote a letter stating that a referral was made for petitioner for a foster home on January 13, 2021. However, no such placements were found.

On February 22, 2021, the circuit court conducted petitioner's adjudicatory hearing, during which petitioner admitted to one count of first-degree sexual abuse in exchange for the dismissal of two other counts. Petitioner admitted to touching his "private with [his sister's]" "eight or nine times." The circuit court adjudicated petitioner as a delinquent. However, placement was delayed at that hearing by agreement. At that point, petitioner had been accepted into another facility with two other potential facility placements pending. During the hearing, Dr. Hudson testified that petitioner's crime against the sister was a crime of opportunity, rather than "excessive aggression." According to Dr. Hudson, although petitioner had sympathy for the victim, he appeared "not to have a good understanding of how what had happened might have affected her." Dr. Hudson recommended "sex-offender-specific individual therapy to focus on relapse prevention strategies" and treatment for possible personality disorders, specifically Dialectical Behavior Therapy ("DBT") to help regulate petitioner's emotions. He continued to recommend that petitioner have no unsupervised contact with younger children and that he receive a high level of supervision.

3

According to Dr. Hudson, the ideal placement would be a foster home where petitioner was the only child, in addition to outpatient treatment. While Dr. Hudson was aware of the River Park program, he did not "have a great deal of knowledge of the day-to-day workings of the program" and did not know that River Park offered the DBT program. Dr. Hudson further explained that he preferred outpatient treatment for petitioner because it was the least restrictive alternative and due to petitioner's history of caregiver instability. He suggested that petitioner continue to seek treatment with his current psychologist in order to develop positive interactions with adults and that if a foster placement was not possible, either treatment at a solely sex offender treatment program or one that treats behavior issues and sex offenders would be reasonable. Dr. Hudson contended that the best choice for petitioner was to remain in the community if "there is not a significant risk of additional victimization and where he can be generally well supervised."

On February 22, 2021, petitioner's treatment facility referral was filed, showing that twenty-nine facilities were contacted, with eight declining placement, one accepting, seven requesting additional information, eleven failing to respond, and two noted as closed. By order entered on March 4, 2021, the court found that petitioner admitted the allegations contained in the petition. Petitioner remained in the custody of the DHHR, which was to make reasonable efforts to achieve permanency. The matter was referred to the juvenile probation officer for an investigation and recommendation regarding final disposition. On March 17, 2021, the division of probation services completed a pre-disposition report, detailing petitioner's familial and behavioral history, including a history of manipulating his younger siblings and inappropriate behaviors by petitioner while at the shelter. At the March 3, 2021, MDT meeting, the director of River Park detailed the potential treatment plan for petitioner, including sex offender therapy, individual therapy, DBT therapy by DBT trained therapists, and an on-ground school. The director at Burlington also spoke to the MDT, stating that it would be difficult for petitioner to receive sex offender specific treatment at that facility. The Burlington director was also concerned with petitioner's behaviors, noting that should the behaviors continue petitioner may face repercussions from peers in the program and that petitioner's safety could not be guaranteed.

During the March 25, 2021, dispositional hearing, the parties informed the circuit court that they could not agree on a placement. Petitioner had been accepted at River Park and Burlington, and the DHHR believed River Park was the proper placement due to petitioner's adjudication as a sex offender, in addition to his continued sexually inappropriate comments while in the shelter. Further, River Park could provide the DBT program recommended by Dr. Hudson, and Burlington had serious reservations about petitioner's acceptance. In response, petitioner argued that sex offender treatment was not the primary treatment he needed and the DHHR had failed to expeditiously seek appropriate foster placements until January of 2021. Petitioner also argued that the DHHR sought placement at River Park without looking at other options so by the time of disposition no other options existed. Petitioner asked to be placed at Hermitage House in Tennessee or Abraxas in Pennsylvania. In addition, petitioner expressed concern for his safety if placed at River Park.

Petitioner's treating physician, Dr. Kissinger, testified that River Park was not an appropriate placement for petitioner because "his mental state and motivations for offending . . . are not the traditional sex offender." He took issue with the manner in which River Park "kind of group[s] everyone together." Dr. Kissinger was, however, unaware of petitioner's recent incidents

4

involving sexually inappropriate comments to younger children or that he had pulled his pants down at the shelter and told a twelve-year-old at the shelter to do the same. According to Dr. Kissinger's testimony, he believed that petitioner had improved but should not be left alone with younger children. Dr. Kissinger stated that petitioner would benefit from a program that helped address detachment issues, cognitive distortions, and other behaviors. He noted that no West Virginia facility met his criteria but that Abraxas and Hermitage House would. It was Dr. Kissinger's expressed belief that petitioner should remain at the shelter until his next placement.

Ms. Mull testified that she had not made a referral to either Abraxas or Hermitage House and noted that she was "not allowed to do that until we have tried all in-state facilities first. The ICPC Committee will require proof that I have done that, and that we have tried them and that they have failed." She also informed the circuit court that all in-state facilities, aside from Burlington and River Park, had declined to accept petitioner. The State argued that River Park was the only appropriate placement, as petitioner would be around younger children at Burlington. In response, petitioner argued that DHHR policy provided that if there is not an appropriate in-state facility then an out-of-state facility may be used; he asserted that River Park was not an appropriate placement. However, the court found that the River Park placement was appropriate, as it had both sex offender specific therapy and DBT therapy, as well as other therapies, whereas Burlington did not have sex offender specific therapy. The court further noted that River Park had a school on the grounds.

On April 2, 2021, the circuit court entered an order finding that the State requested petitioner be placed at River Park, as it was an appropriate placement. It further found that petitioner admitted to the allegations in the petition and was, thus, in need of sex offender specific therapy. Petitioner was committed to the custody of the Division of Juvenile Services for the sexual abuse in the first-degree offenses until he turns twenty-one, but the sentence was suspended and petitioner was placed on probation. The order also directed that the DHHR place petitioner at River Park. Petitioner appeals from that order.

"[T]he standard of review with regard to a circuit court's sentencing order or disposition . . . is whether the circuit court's ruling constitutes an abuse of discretion." *State v. Kenneth Y.*, 217 W. Va. 167, 170, 617 S.E.2d 517, 520 (2005) (citations omitted). "[D]iscretionary, dispositional decisions of the trial courts should only be reversed where they are not supported by the evidence or are wrong as a matter of law." *In re Thomas L.*, 204 W. Va. 501, 503, 513 S.E.2d 908, 910 (1998) (internal quotations and citation omitted).

On appeal, petitioner sets forth two assignments of error. First, he asserts that the circuit court erred by ordering his placement in a roundtable program at River Park[2] for sex offender treatment, as it was not the statutorily required "least restrictive alternative" for placement. In his second assignment of error, petitioner argues that the circuit court erred by finding that the DHHR was making reasonable efforts to achieve permanency for him. He contends that the DHHR did

---

[2] River Park refers to its adolescent sex offender program as its roundtable program. According to River Park, the roundtable program is a unique, psychiatric residential treatment program for adolescent male sex offenders between ages twelve and seventeen.

not make statutorily required nor court-ordered referrals for possible placements and never truly considered any placement for him other than River Park.

Subsequent to the filing of this appeal, petitioner went to River Park in order to participate in the roundtable program. According to the status reports from the parties, petitioner did not successfully complete the roundtable program at River Park. Thus, the issue of whether petitioner should be placed at River Park is moot. As of the filing of status updates by both parties in May of 2022, A.W. was housed at the Gene Spadaro Juvenile Center, while receiving treatment at the Sam Perdue Juvenile Center; both of these facilities are located in West Virginia. The plan was for petitioner to be transferred to the Sam Perdue Juvenile Center if and when housing became available there, possibly in June of 2022. This Court also notes that petitioner turned eighteen on August 18, 2022. According to the status reports, petitioner does not wish to return to his grandparents' home, so the permanency plan is to transition to independent living. Petitioner's counsel represents that the transition to independent living cannot occur until petitioner completes a treatment program.

This Court finds it appropriate to address petitioner's "least restrictive alternative" argument in conjunction with our consideration of the DHHR's efforts to find an appropriate placement for petitioner. Petitioner's argument as to the first point is focused on his placement at River Park when he desired to be placed in certain other out-of-state facilities. With regard to the DHHR's efforts, he relies upon portions of West Virginia Code § 49-4-406(b)[3] to argue that the DHHR failed to conduct a comprehensive assessment and develop a recommended service plan to present to the circuit court and the MDT. Petitioner further argues that the DHHR's focus on in-state placements is inconsistent with the requirements of West Virginia Code § 49-4-714(c), which provides that "in any case in which the court decides to order the juvenile placed in an out-of-state facility or program, it shall set forth in the order directing the placement the reasons the juvenile was not placed in an in-state facility or program."

---

[3] This statute provides, in relevant part, as follows:

> When a juvenile is adjudicated as a delinquent or has been granted a pre-adjudicatory community supervision period pursuant to § 49-4-708 of this code, the court, either upon its own motion or motion of a party, may require the Department of Health and Human Resources to convene a multidisciplinary treatment team and conduct an assessment, utilizing a standard uniform comprehensive assessment instrument or protocol, including a needs assessment, to determine the juvenile's mental and physical condition, maturity and education level, home and family environment, rehabilitative needs and recommended service plan, which shall be provided in writing to the court and team members. . . . In any delinquency proceeding in which the court requires the Department of Health and Human Resources to convene a multidisciplinary treatment team, the probation officer shall notify the department at least 15 working days before the court proceeding in order to allow the department sufficient time to convene and develop an individualized service plan for the juvenile.

W. Va. Code § 49-4-406(b).

The bedrock of our juvenile laws is rehabilitation, not punishment. *See State v. McDonald*, 173 W. Va. 263, 267, 314 S.E.2d 854, 858 (1984) ("We have long recognized that the purpose of our juvenile law is to promote the rehabilitation of troubled children, rather than to punish them."). West Virginia Code § 49-4-714(b)(6) provides, in part, that "[t]he court shall make all reasonable efforts to place the juvenile in the least restrictive alternative appropriate to the needs of the juvenile and the community." Moreover, Rule 34(a) of the West Virginia Rules of Juvenile Procedure provides as follows:

> Juveniles adjudicated as delinquent or status offenders are entitled to be sentenced in the least restrictive manner possible that will meet their needs and protect the welfare of the public. The goal in disposition should be the rehabilitation of the juvenile to enable and promote becoming a productive member of society. In disposition, the court has discretion when determining terms and conditions, and is not limited to the relief sought in the petition. The court shall consider the best interests of the juvenile and the welfare of the public when rendering its decision.

In addition, with regard to out-of-state placements, this Court has held:

> "'While a circuit court should give preference to in-state facilities for the placement of juveniles, if it determines that no in-state facility can provide the services and/or security necessary to deal with the juvenile's specific problems, then it may place the child in an out-of-state facility. In making an out-of-state placement, the circuit court shall make findings of fact with regard to the necessity for such placement.' Syllabus point 6, *State ex rel. W.Va. DHHR v. Frazier,* 198 W.Va. 678, 482 S.E.2d 663 (1996)." Syllabus Point 6, *State ex rel. Ohl v. Egnor,* 201 W.Va. 777, 500 S.E.2d 890 (1997).

Syl. Pt. 1*, State ex rel. Daniel M. v. W. Va. Dep't of Health & Hum. Res.*, 205 W. Va. 16, 516 S.E.2d 30 (1999).

The State asserts that petitioner's placement was the least restrictive alternative under the circumstances, and that the circuit court did not ignore placement recommendations in this matter. The record reveals that the court carefully considered petitioner's placement at each step. Petitioner's brief glosses over the biggest impediment to his placement—his admission to sexually abusing his adoptive sister multiple times, in addition to his continued inappropriate sexualized behaviors with young children at the shelter. In January of 2021, petitioner's counsel even admitted that petitioner was difficult to place in a foster home due to his behaviors and the requirement he not be placed in a home with younger or female children. Moreover, as the State observes, petitioner has not shown that any foster placement was available under these circumstances. The court had a duty to consider both petitioner's rights and the safety of the public in ordering placement for petitioner. As to the former, our review of the record reveals that the court recognized petitioner's need for, among other things, continuity of care. The circuit court expressly stated that it did not want to place petitioner in any home or facility if it was likely to be short-term. While petitioner requested placement at Hermitage House, the DHHR worker testified that she had had a lot of difficulty with that facility, including that it is not as communicative as the

team would like them to be. Thus, it is apparent from the record that the DHHR's efforts to achieve permanency under the circumstances were sufficient.

This Court also notes that the State does not point us to a recommended service plan, which was required. However, under the specific facts and circumstances of this case, particularly due to the circuit court's and the MDT's thoughtful consideration of petitioner's admissions and his need for various types of therapy, we find that the lack of a written plan was harmless error. Therefore, based upon our review of the record and the arguments of the parties, we find that the circuit court did not err in entering its April 2, 2021, order.

Affirmed.

**ISSUED:** August 30, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn