# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2016 Term

**FILED**

**November 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 15-0662

**MONONGALIA COUNTY BOARD OF EDUCATION AND
FRANK D. DEVONO, SUPERINTENDENT,
Respondents Below, Petitioners**

**V.**

**AMERICAN FEDERATION OF TEACHERS – WEST VIRGINIA, AFL-CIO;
JUDY HALE, ITS PRESIDENT;
SAM BRUNETT, JEANIE DEVINCENT, SHELLY GARLITZ,
AND MIKE ROGERS,
AS REPRESENTATIVES OF SIMILARLY SITUATED INDIVIDUALS,
Petitioners Below, Respondents**

---

**Appeal from the Circuit Court of Monongalia County
Honorable Phillip D. Gaujot, Chief Judge
Civil Action No. 11-C-759
REVERSED**

---

Submitted: September 21, 2016
Filed: November 2, 2016

Howard E. Seufer, Jr.
Bowles Rice LLP
Charleston, West Virginia
Kimberly S. Croyle
Ashley Hardesty Odell

Mark W. Carbone
Jeffrey G. Blaydes
Carbone & Blaydes, P.L.L.C.
Charleston, West Virginia
Robert M. Bastress, Jr.

Bowles Rice LLP
Morgantown, West Virginia
Attorneys for the Petitioner

Patrick Morrisey,
Attorney General
Kelli D. Talbott,
Senior Deputy Attorney General
Charleston, West Virginia
Attorneys for Amicus Curiae,
The West Virginia Board of Education

Denise M. Spatafore
Jason S. Long
Dinsmore & Shohl LLP
Morgantown, West Virginia
Attorneys for Amicus Curiae,
The West Virginia Regional Education
Service Agencies

Laura Lilly Sutton
Martinsburg, West Virginia
Attorney for Amicus Curiae,
West Virginia Association of School
Administrators

Kathy M. Finsley
Steptoe & Johnson PLLC
Wheeling, West Virginia
Amy M. Smith
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Attorneys for Amicus Curiae,
West Virginia School Board Association

Morgantown, West Virginia
Attorneys for the Respondent

Andrew J. Katz
Charleston, West Virginia
Attorney for Amicus Curiae,
West Virginia Education Association

John Everett Roush
Charleston, West Virginia
Attorney for Amicus Curiae,
The West Virginia School Service
Personnel Association

Thomas P. Maroney
Maroney Williams Weaver & Pancake
PLLC
Charleston, West Virginia
Attorney for Amicus Curiae,
The West Virginia AFL-CIO

JUSTICE DAVIS delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.  The definition of "classroom teacher," set out in W. Va. Code § 18A-1-1 (2009) (Repl. Vol. 2016), is not intended to include within its meaning an "interventionist," who provides instruction to an individual student or a small group of students for the purpose of intervening in the education of students who are deficient in one or more particular subjects.

2.  Pursuant to 126 W. Va. C.S.R. §§ 72-2.5.c & d (2015) and 126 W. Va. C.S.R. § 72-3.13 (2015), a county board of education may contract with its Regional Education Service Agency (RESA) for the provision of interventionist services to its students.

**Davis, Justice:**

In this case, the Monongalia County Board of Education challenges a ruling by the Circuit Court of Monongalia County that found a county board of education could not contract with a Regional Education Service Agency ("RESA") to provide educational interventionists to county elementary and middle school students when those interventionists are hired by the West Virginia Board of Education ("State Board") operating through a RESA. The circuit court rested its conclusion on its determination that an interventionist met the statutory definition of a teacher and, therefore, must be directly hired by a county board of education. After reviewing the parties' briefs[1] and hearing their oral arguments, and having also considered the relevant law, we find the legislative scheme for the RESA program evidences a legislative intent that county boards be authorized to contract with RESAs to provide interventionist services to county students; therefore, we reverse the circuit court.

---

[1]We acknowledge the contribution of the following amici curiae who filed briefs in this case: The West Virginia Board of Education; The West Virginia Regional Education Service Agencies; West Virginia Association of School Administrators; West Virginia School Board Association; West Virginia Education Association; The West Virginia School Service Personnel Association; and The West Virginia AFL-CIO. We value the participation of the amici and will consider their briefs in conjunction with the parties' arguments.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

The dispute in this case arises from the use of educational interventionists to assist school children in Monongalia County who need educational support beyond that provided by the regular classroom teacher, *i.e.*, tutoring, in the subjects of reading and math. The Monongalia County Board of Education ("MCBOE") asserts that by utilizing interventionists it is able to provide supportive program-based instruction to over three hundred struggling elementary and middle school students each year. According to the circuit court,

19. "Interventionists" provide personalized training to students who are struggling in reading and math. They are used to supplement the normal lesson plan of the child's regular teacher. The children remain in the class for a portion of the lesson and then are either pulled from the class or segregated within the classroom to receive supplemental instruction from the "Interventionist."

20. . . . . Most [interventionists] are assigned to one school and work as little as two and a half hours, or as much as six hours a day. . . .

21. "Interventionists" are paid twenty-five dollars ($25.00) per hour, regardless of their level of training or experience. They do not receive benefits such as health insurance, retirement, paid lunch breaks, or planning periods. They are at-will employees and have no right or expectation of being rehired from year to year.

22. The method used to fill "Interventionist" positions begins when the job is posted on the RESA VII website. The

2

main requirement for this position is that the individual be a certified teacher.

23. At times, RESA VII employees interview the applicant, and other times, both MCBOE and RESA VII employees conduct joint interviews. The hiring decision is ultimately made by the RESA VII Director.

The MCBOE explains that the support provided to a student by an interventionist is designed by the student's teacher, school psychologist, and academic coach, among others, to intervene in a student's education before the student has failed a subject. Accordingly, interventionists do not engage in planning, grading, assessment, parent communication, or other responsibilities carried out by classroom teachers. Interventionists are, however, required to be certified teachers.

The interventionists utilized by MCBOE are obtained through a contract it has with its RESA,[2] which is RESA VII. The interventionists hired by RESA VII[3] are employees of the State Board. The MCBOE contracts with RESA VII to provide the services of

---

[2]Regional Education Service Agencies ("RESAs") are established by statute and implemented by the State Board pursuant to W. Va. Code § 18-2-26 (2002) (Repl. Vol. 2012). *Accord* W. Va. Code § 18-2-26 (2015) (Repl. Vol. 2016). There are eight separate regions in West Virginia, which each have a designated RESA. Monongalia County is one of several counties in RESA VII.

[3]RESA VII's "Strategic Plan," which is approved by the State Board, authorizes RESA VII to employ interventionists.

3

interventionists in schools eligible for Title I services.[4]  In schools not eligible for Title I

funding, the services of interventionists also are obtained through a contract with RESA VII,

but the interventionists' services are paid for through the MCBOE's General Fund.[5]

Relevant to the instant dispute, during a board meeting on September 27, 2011,

MCBOE approved the expenditure of Title I funds to contract with RESA VII for the

services of four interventionists, each to be assigned to a specific Title I qualifying school.

---

[4]According to the website of the West Virginia Department of Education,

> Title I provides financial assistance to LEAs (Local Educational
> Agencies) and schools with high numbers or percentages of poor
> children to help ensure that all children meet challenging state
> academic standards.  LEAs target Title I funds to schools with
> the highest percentages of children from low-income families.
> Unless a participating school is operating a schoolwide program,
> the school must focus Title I services on children who are
> failing, or most at risk of failing, to meet state academic
> standards.  Schools in which poor children make up at least 40
> percent of enrollment are eligible to use Title I funds for
> schoolwide programs to serve all children in the school.  LEAs
> also must offer to utilize Title I funds to provide academic
> enrichment services to eligible children enrolled in private
> schools.

https://wvde.state.wv.us/titlei/ (last visited October 24, 2016).  The MCBOE explains that
Title I funds are distributed as formula grants by the federal government.  Moreover, "[a]
RESA is eligible as a local education agency (LEA) to participate in partnership with or on
behalf of any county school system or school in those programs that will accomplish
implementation of the strategic plan and/or state education initiative."  126 W. Va. C.S.R.
§ 72-2.5 (2010).  *Accord* 126 W. Va. C.S.R. § 72-2.5.d (2015).

[5]The MCBOE avers that the "General Fund" to which it refers does not include
excess levy funds.

In addition, MCBOE approved expenditures from its General Fund to contract with RESA VII for additional interventionists to serve generally at elementary and middle schools in Monongalia County. According to MCBOE, approximately thirty interventionists provided services to Monongalia County students during the 2011-2012 school year.[6]

In or around December 2011, the American Federation of Teachers – West Virginia, AFL-CIO ("AFT"), respondents herein, filed in the Circuit Court of Monongalia County a petition for writ of mandamus, naming MCBOE as the respondent, in which they sought declaratory and injunctive relief. AFT essentially sought a declaration that interventionists are classroom teachers that must be hired by MCBOE, and an injunction to prevent MCBOE from obtaining interventionists through a contract with RESA VII. After a period of discovery, the parties presented cross motions for summary judgment. On January 14, 2014, the circuit court denied the motions. The circuit court then allowed the parties additional time to address questions of fact that had been identified in the court's prior order. These questions pertained to the role and responsibilities of interventionists. Thereafter, following additional discovery, the parties again filed cross motions for summary judgment. By order entered June 9, 2015, the circuit court granted AFT's motion for summary judgment and denied MCBOE's motion. In doing so, the circuit court reluctantly

---

[6]The BOE asserts that interventionists who provided satisfactory service in prior school years were afforded the opportunity to be re-employed in subsequent years.

concluded that an interventionist met the statutory definition of "classroom teacher"; therefore, the position had to be filled through direct employment by MCBOE in accordance with the statutory requirements pertaining to hiring and employment of classroom teachers. This appeal followed.

## II.

### STANDARD OF REVIEW

Although the circuit court did not render its final order in the context of the petition for writ of mandamus that was sought by AFT, it implicitly granted the requested writ by granting summary judgment in favor of AFT. Likewise, the circuit court connotatively declared that MCBOE is prohibited from contracting with RESA VII to obtain the services of interventionists and enjoined it from continuing the practice. Thus, our standard for reviewing the lower court's rulings in this appeal is multifaceted.

It has been made clear that, "[t]o invoke mandamus the relator must show (1) a clear right to the relief sought; (2) a legal duty on the part of the respondent to do the thing relator seeks; and (3) the absence of another adequate remedy." Syl. pt. 2, *Myers v. Barte*, 167 W. Va. 194, 279 S.E.2d 406 (1981). This is so because

> "'[m]andamus lies to require the discharge by a public officer of a nondiscretionary duty.' Point 3 Syllabus, *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W. Va. 479[, 153 S.E.2d 284 (1967)]." Syllabus point 1, *State ex rel.*

6

*West Virginia Housing Development Fund v. Copenhaver*, 153
W. Va. 636, 171 S.E.2d 545 (1969).

Syl. pt. 1, *State ex rel. Williams v. Department of Military Affairs & Pub. Safety, Div. of Corr.*, 212 W. Va. 407, 573 S.E.2d 1 (2002). Our review of the circuit court's grant of mandamus relief is *de novo*: "A *de novo* standard of review applies to a circuit court's decision to grant or deny a writ of mandamus." Syl. pt. 1, *Harrison Cty. Comm'n v. Harrison Cty. Assessor*, 222 W. Va. 25, 658 S.E.2d 555 (2008).

Because this appeal comes to this Court from an order granting summary judgment, we also exercise plenary review of that ruling: "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). In carrying out our plenary review, we bear in mind that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

We additionally review *de novo* the circuit court's declaratory judgment:

> The West Virginia Supreme Court "reviews a circuit court's entry of a declaratory judgment *de novo*, since the principal purpose of a declaratory judgment action is to resolve legal questions." *Farmers & Mechs. Mut. Ins. Co. v. Cook*, 210

7

W. Va. 394, 398, 557 S.E.2d 801, 805 (2001) (*citing* Syl. Pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995)).

*Flowers v. Max Specialty Ins. Co.*, 234 W. Va. 1, 5, 761 S.E.2d 787, 791 (2014). *See also* Syl. pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995) ("A circuit court's entry of a declaratory judgment is reviewed *de novo*.").

To the extent that the circuit court granted injunctive relief, our review is for an abuse of discretion:

> Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse to modify, continue, or dissolve a temporary or a permanent injunction, whether preventative or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion." Syllabus Point 11, *Stuart v. Lake Washington Realty*, 141 W. Va. 627, 92 S.E.2d 891 (1956).

Syl. pt. 5, *Foster v. Orchard Dev. Co., LLC*, 227 W. Va. 119, 705 S.E.2d 816 (2010).

Finally, insofar as our decision necessitates an examination of various statutory provisions and resolution of questions of law, we apply plenary review to those issues as well: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

8

We now proceed to address the issues herein raised while guided by the foregoing principles.

## III.

## DISCUSSION

Resolution of the instant matter depends upon whether the Legislature intends for educational interventionists to be equivalent to regular classroom teachers and therefore subject to all of the same statutory entitlements and requirements as classroom teachers. Ascertaining legislative intent guides our analysis because "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). To determine the legislative intent and thereby decide the question herein presented, we first look to statutory provisions related to teachers to discern whether an interventionist meets the definition of a classroom teacher. We then consider the statutory and regulatory scheme for RESA as it relates to interventionists. Finally, we determine which law applies to the instant dispute.

In our examination of the statutory and regulatory provisions relevant to this matter, we are mindful of the fundamental principles of statutory construction that must be applied. Namely, we recognize that, in order to glean legislative intent, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question,

9

the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). *See also Foster Found. v. Gainer*, 228 W. Va. 99, 110, 717 S.E.2d 883, 894 (2011) ("Statutes whose language is plain must be applied as written."); Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect."). Conversely, "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992). *See also Foster Found. v. Gainer*, 228 W. Va. at 110, 717 S.E.2d at 894 *(*"Statutes . . . whose language is ambiguous must be construed before they can be applied.").

### A. Interventionists as Classroom Teachers

The term "interventionist" is not defined in the West Virginia Code. Accordingly, in order to determine whether an interventionist is the statutory equivalent of a teacher, we begin with an examination of the definition of a teacher. The statutory definition of a classroom teacher is found in W. Va. Code § 18A-1-1(c)(1) (2009) (Repl. Vol. 2016), which defines the term as follows:

> (c) "Professional educator" has the same meaning as "teacher" as defined in section one [§ 18-1-1], article one, chapter eighteen of this code. Professional educators are classified as follows:

(1) "Classroom teacher" means a professional educator who has a *direct instructional* or counseling relationship with students and who spends the majority of his or her time in this capacity[.]

(Emphasis added). The foregoing statute plainly demonstrates that "classroom teacher" is a subclassification of "professional educator." The term "professional educator," in turn, bears the same meaning as the term "teacher," which is defined in W. Va. Code § 18-1-1(g) (2012) (Repl. Vol. 2016). Pursuant to W. Va. Code § 18-1-1(g), "'[t]eacher' means a teacher, supervisor, principal, superintendent, public school librarian or any other person regularly employed *for instructional purposes* in a public school in this state." (Emphasis added). Although the term "instructional," which is used in the foregoing definitions of both "teacher" and "classroom teacher," is not statutorily defined, we are to give the term its common, ordinary meaning. *See* Syl. pt. 1, *Miners in Gen. Grp. v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941) ("In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used."), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982). The common, ordinary, and accepted meaning of "instructional" is "[o]f or pertaining to instruction or teaching; educational. . . . Conveying instruction or information." VII *The Oxford English Dictionary* 1050 (2d ed. 1989).

11

Thus, as pointed out by AFT, strictly applying[7] the foregoing definitions results in the inevitable conclusion that an interventionist meets the statutory definition of a classroom teacher, because an interventionist has a "direct instructional . . . relationship with students," albeit in a form more akin to tutoring than to classroom instruction, and "spends the majority of his or her time in this capacity." W. Va. Code § 18A-1-1(c)(1). *See, e.g., Harmon v. Fayette Cty. Bd. of Educ.*, 205 W. Va. 125, 130, 516 S.E.2d 748, 753 (1999) (observing that "the degree to which a professional educator directly works with students, regardless of the location of such work–and the suitability of alternative classifications–are two important factors in determining whether a professional educator should be classified as a classroom teacher" (footnote omitted)); *Putnam Cty. Bd. of Educ. v. Andrews*, 198 W. Va. 403, 408, 481 S.E.2d 498, 503 (1996) (concluding that educational diagnostician who "spent the majority of her time working directly with students (administering tests) and chairing PAC meetings at which the results of these tests were presented and suggestions based on their results were implemented" was classroom teacher).

---

[7]We recognize, however, MCBOE's assertion that the definitions referred to are not exclusive insofar as the relevant statutes contain a qualification. *See* W. Va. Code § 18A-1-1 (2009) (Repl. Vol. 2016) ("The definitions contained in section one [§ 18-1-1], article one, chapter eighteen of this code apply to this chapter. In addition, the following words used in this chapter and in any proceedings pursuant to this chapter have the meanings ascribed to them *unless the context clearly indicates a different meaning*." (emphasis added)); W. Va. Code § 18-1-1 (2012) (Repl. Vol. 2016) ("The following words used in this chapter and in any proceedings pursuant thereto have the meanings ascribed to them *unless the context clearly indicates a different meaning*." (emphasis added)).

Notably, if interventionists are designated as "classroom teachers," then pursuant to W. Va. Code § 18A-2-1(a) (2013) (Repl. Vol. 2016),[8] it does appear to be mandatory that they be hired by a county board of education: "*The employment of professional personnel shall be made by the board* only upon nomination and recommendation of the superintendent . . . ." (Emphasis added). *See* Syl. pt. 1, *E.H. v. Matin*, 201 W. Va. 463, 498 S.E.2d 35 (1997) ("'It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation.' Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W. Va. 445, 300 S.E.2d 86 (1982)."). *See also* W. Va. Code § 18A-1-1(a) (defining "School personnel," which includes "classroom teacher[s]," as "all personnel employed *by a county board . . . .*" (emphasis added)). Similarly, W. Va. Code § 18A-2-2(a) (2016) (Repl. Vol. 2016)[9] provides, in relevant part, that "[b]efore entering upon their duties, *all teachers shall execute a contract with their county boards . . . .*" (Emphasis added). *See State ex rel. Boner v. Kanawha Cty. Bd. of Educ.*, 197 W. Va. 176, 184, 475 S.E.2d 176, 184 (1996) ("West Virginia Code § 18A-2-2

[8]Although the cited version of W. Va. Code § 18A-2-1 was not in effect at the time this action was filed, the language quoted in the body of this opinion is identical to language appearing in the earlier version of the statute. *See* W. Va. Code § 18A-2-1 (2001) (Repl. Vol. 2012).

[9]Although we cite to the current version of W. Va. Code § 18A-2-2(a), the particular language quoted is identical to that set out in the version of the statute in effect when this action was filed. *See* W. Va. Code § 18A-2-2(a) (2009) (Cumm. Ann. Pkt. Pts. 2009).

is clear in its directive that 'all teachers *shall* execute a contract with their boards of education.' *Id*. (emphasis supplied)."); *State ex rel. Hawkins v. Tyler Cty. Bd. of Educ*., 166 W. Va. 363, 373, 275 S.E.2d 908, 915 (1980) ("The relation between the county board of education and school teachers is a contractual one.  If the board wishes to hire a teacher it must do so by means of a written contract."  (citing W. Va. Code § 18A-2-2; additional citation omitted)).

Nevertheless, we must continue our analysis by considering the provisions pertaining to the role of RESAs and determining whether that role, as it pertains to interventionists, is compatible with the statutory definition of a classroom teacher.

### B.  Interventionists under RESA Provisions

RESAs are established by W. Va. Code § 18-2-26 (2015) (Repl. Vol. 2016).[10] The Legislature has expressly stated its intent for establishing RESAs thusly: "The intent of the Legislature in providing for establishment of [RESAs], hereinafter referred to in this section as agency or agencies, is to provide for high quality, cost effective *education* programs *and services to students*, schools and school systems."  W. Va. Code § 18-2-26(a)

---

[10]The version of W. Va. Code § 18-2-26 in effect during the time relevant to this dispute was enacted in 2002.  However, the portions of the statute upon which we rely are substantively the same in both the 2002 and 2015 versions. *See* W. Va. Code § 18-2-26 (2002) (Repl. Vol. 2012).

(emphasis added).  Plainly, then, the Legislature expressly intended for RESAs to provide, among other things, high quality, cost effective education services to students.  The evidence presented in this case demonstrates that interventionists provide high quality and cost effective educational services to students.  As to quality, we note that interventionists providing contracted services through a RESA must have the same licensure as educators employed directly by county boards of education.  *See* 126 W. Va. C.S.R. § 136-7.1.b.6 (2016).[11]  Additionally, with respect to the cost-effective aspect of utilizing RESA interventionists, the circuit court concluded that

> [t]he opportunity to deploy multiple part-time interventionists, rather than a fewer number of regular full-time employees, results in the ability to offer services to a significantly greater number of students during a school day. . . .  This circumstance exists by virtue of greater flexibility in scheduling multiple interventionists in more than one classroom during the same time period.

(Quotations and citations omitted).

---

[11]Pursuant to 126 W. Va. C.S.R. § 136-7.1.b.6 (2016), "[c]ontracted or RESA Services. – The county superintendent shall assure that an educator providing contracted services or services through a RESA holds the same licensure required for an educator employed by a board of education."  This identical language also appears in earlier versions of the Code of State Rules.  *See* 126 W. Va. C.S.R. § 136-7.1.2.f (2012, 2011, & 2010).  The State Board, as amicus curiae, further explained in its brief that "[m]any of the persons hired as interventionists are retired teachers or those new to the teaching profession that desire a part-time work schedule."

The Legislature also has expressly stated its purpose for establishing RESAs, which includes its vision that RESAs would assist the State Board in implementing programs and services as directed by that body:

> In establishing the agencies [RESAs] the Legislature envisions certain areas of service in which [RESAs] can best assist the state board in implementing the standards based accountability model pursuant to subsection (a) of this section and, thereby, in providing high quality education programs. These areas of service include the following:
>
> . . . .
>
> (6) Developing and/or implementing *any other programs or services* as directed by law, *the state board* or the regional council.

W. Va. Code § 18-2-26(b) (emphasis added). Moreover, the Legislature has mandated that the State Board promulgate rules for the establishment and operation of RESAs: "[t]he state board shall reexamine the powers and duties of [RESAs] in light of the changes in state level education policy that have occurred and shall establish multicounty regional education service agencies *by rule*, promulgated in accordance with the provisions of article three-b [§§ 29A-3B-1 et seq.], chapter twenty-nine-a of this code."[12]  W. Va. Code § 18-2-26(c) (emphasis added).  In accordance with its duty to do so, the State Board promulgated

---

[12]W. Va. Code § 29A-3B-1 *et seq.* is found in the State Administrative Procedures Act and sets out the procedure for the State Board's making of rules.

legislative rules, which have the force and effect of law,[13] governing RESAs. *See* 126 W. Va. C.S.R. § 72.

Among the various legislative rules governing RESAs is one that expressly authorizes RESAs to employ staff "to perform services described in the Strategic Plan or to operate . . . projects that may require staff and support services for effective implementation." 126 W. Va. C.S.R. § 72-3.13 (2010).[14] RESAs also are instructed to develop and/or

_____

[13]*See* Syl. pt. 5, *Smith v. West Virginia Human Rights Comm'n*, 216 W. Va. 2, 602 S.E.2d 445 (2004) ("A regulation that is proposed by an agency and approved by the Legislature is a 'legislative rule' as defined by the State Administrative Procedures Act, *W. Va. Code*, 29A-1-2(d) [1982], and such a legislative rule has the force and effect of law.").

[14]The full text of 126 W. Va. C.S.R. § 72-3.13 (2010) is set out below:

> 3.13. *A RESA may employ staff, as necessary, to perform services described in the Strategic Plan or to operate* demonstration, pilot, or *other projects that may require staff and support services for effective implementation*. Upon the recommendation of a RESA executive director and the State Superintendent, the WVBE will consider the approval of all regular full-time and regular part-time staff at a RESA after a majority of the members of a regional council, by vote, verify that such employment is necessary for effective provision of services to county school systems in the region as set forth in this rule. The WVBE delegates to the State Superintendent the authority to authorize the temporary hiring of regular full-time and regular part-time staff, pending final approval of the WVBE.
>
> 3.13.1. RESA staff who are hired into a position that requires a specified certification must maintain the certification

(continued...)

17

implement programs or services as directed by law or by the State Board.  *See* 126 W. Va.

C.S.R. § 72-5.1.6 (2010).[15]  To the extent that the foregoing provisions authorize RESAs to

[14](...continued)
while employed in that same position at the RESA.

> 3.13.2.  All RESA regular full-time and regular part time personnel are *non-contractual will and pleasure employees of the WVBE*.  Recommendations for termination and suspension of RESA regular full-time and regular part-time personnel will be made by the State Superintendent to the WVBE.

> 3.13.3.  RESAs shall develop consistent and standardized personnel policies.  The RESAs shall submit a copy of such personnel policies, including any changes or updates, to the WVBE.

W. Va. C.S.R. § 126-72-3 (emphasis added).  The foregoing regulation, which was in effect at the time relevant to the instant dispute, has been amended.  The current version became effective in 2015.  Our decision in this case would be the same under either version of this regulation.

[15]The relevant portion of 126 W. Va. C.S.R. § 72-5.1 states:

> 5.1.  Educational services to be provided to the member county boards by RESAs include areas of service in which the agencies can best assist the WVBE [State Board] in implementing the standards-based accountability model pursuant to subsection (a) of W. Va. Code § 18-2-26 in providing high quality education programs.  These areas of service . . . include:

> . . . .

> 5.1.6.  Developing and/or implementing any other programs or services as directed by law or by the WVBE.

The amended version of the above quoted provision is found at 126 W. Va. C.S.R. § 72-5.1.f (2015).  Although the language used in the first paragraph of the 2015 version of this
(continued...)

employ staff to perform services described in the Strategic Plan, and require RESAs to implement programs or services as directed by law or by the State Board, it is noteworthy that strategic plans developed by RESAs must be approved by the State Board. *See* 126 W. Va. C.S.R. § 72-5.4.[16]

Clearly then, under the foregoing provisions, the use of interventionists is in accordance with the authority granted to a RESA to employ staff to perform certain services such as those outlined in its Strategic Plan. *See* 126 W. Va. C.S.R. § 72-3.13; 126 W. Va. C.S.R. § 72-5.1.6. The RESA VII Strategic Plan for the 2011-2012 school year, which, necessarily, was approved by the State Board, contains a specific provision for employing interventionists:

> *Employ certified regional providers* (*interventionists*, OTs, PTs, SLPs, academic and job coaches[)] to provide services as set forth by Individual Education Programs and School Improvement Grants for students within RESA 7.

---

[15](...continued)
regulation is somewhat different than that quoted above, the regulation still requires RESAs to develop and/or implement programs or services as directed by law or by the State Board.

[16]126 W. Va. C.S.R. § 72-5.4 (2010) provides that "[e]ach RESA shall submit, with recommendations from and approval by a majority vote of the regional council, the Strategic Plan to the WVDE [West Virginia Department of Education] by October 1 of each year *for approval by the WVBE* [*State Board*] . . . ." (Emphasis added). Similarly, 126 W. Va. C.S.R. § 72-5.4 (2015) declares that "[e]ach RESA shall submit, with recommendations from and approval by a majority vote of the regional council, the Strategic Plan to the WVBE [State Board] staff by October 1 of each year *for approval by the WVBE* [*State Board*]. . . ." (Emphasis added).

RESA VII Strategic Plan § 3.4. (2011-2012) (emphasis added).[17]  Therefore, insofar as the State Board approved the RESA VII Strategic Plan, it rationally follows that the provision of interventionists is a service RESA VII is directed by the State Board to provide.  This conclusion is in accord with the legislative rule requiring liberal construction of the provisions pertaining to RESAs.  *See* 126 W. Va. C.S.R. § 72.2.8 (2010) ("All functions of the RESAs shall be liberally construed to effectuate the intent of the WVBE [State Board]."[18]

Finally, we observe that, in carrying out duties such as the provision of interventionists, RESAs are expressly empowered to contract with and receive funds from county boards of education:

> *RESAs are empowered to contract with county boards of education*, the West Virginia Department of Education (hereinafter WVDE), persons, companies, or other agencies *to implement their Strategic Plan* (see Section 5.3).  A RESA is eligible as a local education agency (LEA)[19] to participate in partnership with or on behalf of any county school system or

---

[17]Likewise, the RESA VII Strategic Plan for the 2016-2017 school year provides that RESAs may "[e]*mploy certified regional providers* (*interventionists*, OTs, PTs, SLPs, school psychologists and job coaches) to provide services as set forth by Individual Education Programs and School Improvement Grants for students within RESA 7."  RESA VII Strategic Plan § 3.4. (2016-2017) (emphasis added).

[18]This provision is now found at 126 W. Va. C.S.R. § 72.2.6 (2015), and states that "[a]ll functions, powers, and duties of the RESAs shall be liberally construed to effectuate the intent of the WVBE [State Board]."

[19]As explained in footnote 4, *supra*, and its accompanying text, Title I provides financial assistance to LEAs.  Where possible, Title I funds are used to provide the interventionists at issue in this case.

20

school in those programs that will accomplish implementation of the strategic plan and/or state education initiative.

126 W. Va. C.S.R. § 72-2.5 (2010) (emphasis and footnote added).[20] With respect to receiving funds, 126 W. Va. C.S.R. § 72-4.4 (2010) provides that

> [a] RESA may receive and disburse funds from . . . *member counties*, . . . the funds of which will contribute to RESA initiatives. Each RESA is encouraged to partner with member school systems, particularly those designated as low-performing, and other organizations as appropriate to attract and leverage resources available from federal programs to maximize its capacity for meeting the needs of member schools and school systems . . . .

(Emphasis added).[21] *See also* W. Va. Code § 18-2-26(h) (authorizing RESAs to "receive and disburse funds from . . . member counties").[22]

To summarize, the plain language of the foregoing statutes and legislative rules pertaining to RESAs demonstrate that the Legislature intended for RESAs to be enabled to provide, among other things, interventionist services to county boards of education through contracts with the county boards.

---

[20]This provision is found in the 2015 version of the regulations at 126 W. Va. C.S.R. §§ 72-2.5.c & d with slight language differences that would not change the outcome of our decision in this case.

[21]The language of the 2015 version of 126 W. Va. C.S.R. § 72-4.4 is substantially the same as that quoted above.

[22]Although the 2002 version of W. Va. Code § 18-2-26 was in effect during the time relevant to this dispute, the above quoted language is identical in both the 2002 and the 2015 versions of this statute. *See supra* note 10.

21

## C. Governing Law

Based upon the analyses set out above, this Court is now faced with two legislative schemes applicable to interventionists: one governing classroom teachers and one governing RESAs. Under the statutory provisions pertaining to classroom teachers, an interventionist must be employed by a county board of education. On the other hand, the RESA provisions allow county boards to contract with RESAs to obtain interventionist services for their students. Thus, while both legislative schemes are applicable, they also are inconsistent and irreconcilable.

We find that the rules of statutory construction favor application of the RESA scheme to this matter. This Court has observed that, "'where two distinct statutes stand in *pari materia*, and sections thereof are in irreconcilable conflict, that section must prevail which can properly be considered as the last expression of the law making power . . . .' *State ex rel. Pinson v. Varney*, 142 W. Va. 105, 109, 96 S.E.2d 72, 74 (1956)." *Stanley v. Department of Tax & Revenue*, 217 W. Va. 65, 71, 614 S.E.2d 712, 718 (2005). Under this doctrine, the RESA scheme prevails because the statute establishing RESAs was last amended in 2015, and the legislative rules governing RESAs also were last amended in 2015. Moreover, the RESA strategic plans, such as the RESA VII strategic plan that specifically provides for the hiring and use of interventionists, are approved by the State Board on an annual basis. *See* 126 W. Va. C.S.R. § 72-5.4 (2010) (establishing that "[e]ach RESA shall

22

submit . . . the Strategic Plan to the WVDE [West Virginia Department of Education] by October 1 of each year for approval by the [State Board]. . . .").  *See also* 126 W. Va. C.S.R. § 72-5.4 (2015) (providing that "[e]ach RESA shall submit . . . the Strategic Plan to the [State Board] staff by October 1 of each year for approval by the [State Board]. . . .").  Conversely, the statute setting out the definition of the term "classroom teacher" was last amended in 2009.

> In addition, it is well established that
>
> "[t]he general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled."  Syl. pt. 6, *Carvey v. West Virginia State Bd. of Educ.*, 206 W. Va. 720, 527 S.E.2d 831 (1999) (internal quotations and citations omitted).  *See also In re Chevie V.*, 226 W. Va. 363, 371, 700 S.E.2d 815, 823 (2010) ("As a rule, when both a specific and a general statute apply to a given case, the *specific* statute governs.").

*Teets v. Miller*, 237 W. Va. 473, ___, 788 S.E.2d 1, 12 (2016).  In the case *sub judice*, the various RESA provisions provide the more specific law in that they specifically address the issues herein raised, *i.e.*, granting authority for RESAs to both employ individuals to provide services to school children and to enter contracts with county boards of education. Furthermore, the relevant rules require incorporation of the State Board approved RESA strategic plan, which, in this instance, expressly provides for interventionists. The foundation for the argument that interventionists must be considered classroom teachers, on the other

23

hand, rests solely upon W. Va. Code § 18A-1-1(c)(1), a statute that simply defines the term "classroom teacher" and contains no provision expressly pertaining to interventionists.

Accordingly, based upon the analysis set out in this opinion, we now hold that the definition of "classroom teacher," set out in W. Va. Code § 18A-1-1 (2009) (Repl. Vol. 2016), is not intended to include within its meaning an "interventionist," who provides instruction to an individual student or a small group of students for the purpose of intervening in the education of students who are deficient in one or more particular subjects. In addition, we hold that, pursuant to 126 W. Va. C.S.R. §§ 72-2.5.c & d (2015) and 126 W. Va. C.S.R. § 72-3.13 (2015),[23] a county board of education may contract with its Regional Education Service Agency (RESA) for the provision of interventionist services to its students.

## IV.

## CONCLUSION

For the reasons set out in the body of this opinion, we conclude that the legislative scheme for the RESA program evidences a legislative intent that county boards

---

[23]Although we utilize current versions of the Code of State Rules in our holding for ease of reference, our decision applies equally to the earlier versions of the Rules discussed in the body of the opinion.

be authorized to contract with RESAs to provide interventionist services to county students.

Accordingly, we reverse the June 24, 2015, order of the Circuit Court of Monongalia County.

Reversed.